JOHN S. GITTINGS *vs.* WILLIAM E. MAYHEW.

The defendant subscribed $500 " for the purpose of erecting an *Atheneum* in the city of Baltimore," to be paid " when the whole amount of $25,000 shall have been subscribed, and in such instalments as may be required by

Gittings *vs.* Mayhew.

the building committee." The plaintiff was treasurer of the fund and the unpaid subscriptions were called in by resolution of the committee, "payable to" him. HELD :

1st. That the term "*Atheneum*" is sufficiently definite, and the contract is not therefore void for want of a sufficient and certain subject matter.

2nd. The facts that the required amount was subscribed, and that the committee made contracts and erected and completed the building relying upon the good faith of the subscribers, constitute a sufficient consideration for the contract.

3rd. But the plaintiff being merely the custodiary of the fund and not named as payee in the subscription, and not having done the work in reliance on the subscriptions, cannot maintain the suit; the call made by the committee only made him an agent to collect, but did not give him the right to sue.

4th. Before The Atheneum was incorporated the right to sue was in the building committee, but whether the subscribers were liable after the charter was obtained and on whom the right of action then devolved, depend on their agency in procuring it, or their assent thereto or acquiescence in the acts of the corporators looking to the consummation of the plan originally contemplated by the subscribers.

The fact that advances were made or expenses or liabilities incurred by others, in consequence of voluntary subscriptions, before notice of withdrawal, is sufficient to make them obligatory, provided the advances were authorised by a fair and reasonable reliance on the subscriptions.

It is safer that a private right should fail, or a wrong go unredressed, than that settled principles should be disregarded in order to meet the equity of particular cases.

APPEAL from Baltimore county court.

*Assumpsit* by the appellee against the appellant, on a subscription of $500 for the purpose of erecting an Atheneum in the city of Baltimore. The suit was brought in September 1848, by the plaintiff, as treasurer of the fund for building the Atheneum.

The *first* count in the declaration alleges, that a design was formed by the plaintiff and divers other persons to raise a fund, by subscription, for the purpose of erecting in the city of Baltimore a building to be called The Atheneum; that a subscription book was prepared, in which it is stated that the plaintiff was treasurer of the fund, and that six persons (who are named) were the building committee, and contained this agreement: "The undersigned agree to pay the sum set opposite to their respective names when the whole amount of

$25,000 shall have been subscribed, and in such instalments as may be required by the building committee for the purpose of erecting an Atheneum in the city of Baltimore," to which book and agreement the defendant subscribed his name and set opposite thereto the sum of $500; that afterwards the said book and agreement were shown to divers other persons, who thereupon subscribed various sums for said purpose, and the sum of $25,000 was fully subscribed and paid; that afterwards, on the 6th of June 1848, the building committee passed this resolution: "*Resolved*, that with a view to the final payments to be paid for the building of The Atheneum, the unpaid subscriptions to the building fund be and they are hereby called in, payable to William E. Mayhew, treasurer, in instalments of $75 each, (where the subscriptions exceed that amount,) payable on the 20th day of June, instant, and in like manner weekly thereafter till the whole shall be paid, and when the subscriptions do not amount to $75, that they be and they are hereby called in to be paid on said 20th day of June, and that the committee on title be requested to act as counsel to The Atheneum, and take legal measures for the recovery of any instalments or subscriptions which may not be promptly paid as above," of which the defendant had notice, whereby he became bound to pay to the plaintiff, as treasurer as aforesaid, said sum of $500, at the times and according to the terms mentioned in said resolution, all which times are now passed, in consideration whereof the defendant undertook and promised to pay the same to the plaintiff, &c. The declaration also contains counts for work and labor, materials furnished, and the common money counts. The pleas were *non assumpsit* and limitations.

*1st Exception.* The plaintiff offered in evidence the subscription book containing the subscription of the defendant, which was admitted to be in his handwriting. This book has upon its first page the plaintiff's name as treasurer, and lists of the names of the building committee and committee on collections, and preceding the signature of the subscribers the heading or agreement set out in the *nar.* Eight persons

subscribed before the defendant, whose subscriptions amounted to $4500, and seven after him, each for $500.   It was further proved by the minutes of the proceedings of the building committee, and other evidence, that early in the year 1845 a movement was made on the part of the Baltimore Library Company and the Maryland Historical Society to raise a sum, by voluntary contributions from the citizens of Baltimore, sufficient to erect a building to be called "The Atheneum," which should accommodate the libraries of the two institutions, and furnish a room for a reading room, to be under the charge of the Library Company, and for a gallery for paintings, to be under the charge of the Historical Society; that to carry out this plan a committee of five from each of these societies was appointed, on the 6th of February 1845, and on the 13th of that month one of them reported a plan and estimate of such a building, and a sub-committee was appointed to report a plan necessary for its erection, as well as for its government and ownership; that subsequently the plan was enlarged so as to embrace the Mercantile Library Association; that the building committee, consisting of the persons mentioned in the *nar*, and a collecting committee were appointed, and the plaintiff chosen treasurer of the fund; that the defendant made his subscription in May 1845, and at the time he made it Mr. Tiffany, who solicited the same, read over to him the names of the officers, including that of the plaintiff as treasurer, informed him that the Baltimore Library Company would need another place for their accommodation, the building occupied by them having been sold, that it was important to provide some suitable place for their library and a large reading room where strangers could be introduced, and a place for the accommodation of the Maryland Historical Society, including a gallery of art, and to give the Mercantile Library Association a room free of rent, that every subscription was a donation; defendant then subscribed his name for $500, and expressed his gratification at the opportunity of uniting with other citizens in the erection of an Atheneum, and hoped the committee would faithfully execute their duty.

On the 12th of January 1846, the joint committee met, and subscriptions to the amount of $29,000 having been reported, it was resolved that the legal title to the property to be purchased should be vested in a corporation to be called the "Baltimore Atheneum," whereof the trustees should be elected annually, three from each of the societies, and that an act of incorporation should be obtained from the legislature, which was done by the act of 1845, ch. 122, passed on the 17th of February 1846, which was duly accepted. A lot of ground was purchased on the 9th of May 1846, for $7500, from one Wilson and wife, and conveyed by deed of the 27th of June 1846.

This deed recites, that whereas certain individuals in the city of Baltimore have subscribed and contributed as a free gift a large sum of money, for the purpose of purchasing a lot in said city and erecting thereon a building to be called The Atheneum, which subscription was made upon the express condition that said lot and edifice should be devoted to scientific, literary and artistical purposes, under the direction of the Baltimore Library Company and the Maryland Historical Society, who had expressly agreed that in case either should be dissolved, or without the consent of the other, should sell, dispose of or mortgage its interest in said property, or in case the same should be sold under execution or other process of law, then its whole interest therein shall cease and vest in the other; and that in order to preserve the legal title therein for the use and benefit of said societies the act of 1845, ch. 122, was passed. And whereas said act, after reciting that there is reason to believe a portion of said subscriptions was made with a view to the accommodation of the Mercantile Library Association of Baltimore in the building so to be erected, provides, that the two first named societies shall have full power and authority to make such arrangements as shall be practicable for the permanent accommodation of the latter in such building. And whereas the two first named societies have purchased the lot hereby conveyed, for the purpose above mentioned, for $7500, and have paid for the same out of the

money subscribed and contributed as aforesaid, and have requested the grantors to execute this deed to said Atheneum in pursuance of said agreement and act of Assembly. Now this indenture witnesseth, &c. The deed then conveys the lot to the said Atheneum, and its successors and assigns, in trust for the use and benefit of the two first named societies, subject to the above mentioned agreement between them, and any other lawful agreement they may hereafter make as to the use, erection, management, direction and disposal of said lot and building, and also to any arrangement they may make for the permanent accommodation therein of said last named association.

It was further proved that a building was erected on the lot, at a cost, including the lot, of between $33,000 and $34,000, and that all the money collected from the subscribers was applied towards its payment, and was insufficient for the purpose by several thousand dollars, which was assumed by the two first named societies, and that all the subscriptions so far as collectable will not be sufficient to pay the said balance. That the building was, in the opinion of the witnesses, devoted to literary purposes, that there were libraries of the three societies in it, and a reading room of newspapers in each of the rooms of the two first named societies.

Prior to the 6th of June 1848, when the resolution stated in the *nar* was passed by the building committee, two of the members of that committee, who were such at the time the defendant made his subscription, had died or resigned, and the presidents of the two first named societies were added thereto. The defendant had due notice of the passage of this resolution, and a call was made upon him for the payment of his subscription, in accordance therewith. The charters of the Baltimore Library, the Maryland Historical Society, and the Mercantile Library Association, were also read in evidence. The defendant then asked the following instructions to the jury:

1st. That upon the pleadings and proofs in the cause, the plaintiff is not entitled to recover upon the first count in the

declaration, because the evidence does not show a state of case, as forms a legal basis of such a promise as the plaintiff has alleged in pleading.

2nd. That the subscription offered in evidence by the plaintiff, creates no legal liability upon him, which is capable of enforcement in a court of law, at the suit of the plaintiff in this case.

3rd. That if the jury find that after the subscription, and before payment of any money by any of the subscribers, the act of 1845, ch. 122, was passed and accepted, and that the subscriptions when paid were devoted to the use of the said corporation called The Atheneum, and that defendant never concurred in any way in the application for said act, and never assented thereto, but continually refused so to do, and that no notice was given to him of any intended meeting, to consider of the proposed application for said act, or of its acceptance, and that the property conveyed to The Atheneum by the deed of June 1846, was purchased, and the improvements thereon paid for, so far as paid for, out of the funds from said subscriptions, and that all of them, as far as paid, have been so applied, leaving a balance unpaid, which has been provided for by the Baltimore Library Company, and the Maryland Historical Society, and that if all the subscriptions which can be collected shall be applied to pay said balance, will be insufficient for the purpose, then the plaintiff is not entitled to recover in this case.

4th. That by the terms of the subscription, the call made by the resolution of the 6th of June 1848, was not such a call as entitles the plaintiff to maintain this suit.

The court (FRICK, C. J., and LE GRAND, A. J.,) rejected all these prayers, and to this ruling the defendant excepted.

*2nd Exception.* The defendant then offered in evidence the act of 1824, ch. 7, incorporating the Baltimore Atheneum, and proved that the building held by that corporation was held as property by the stockholders, and governed by directors elected in the manner prescribed by the act, that lectures were delivered there on different subjects, and portions of it

rented out for offices, &c., until destroyed by fire. He further proved that the present building consists of three stories: the upper consisting of four rooms, is appropriated to the use of the Maryland Historical Society; the second, of the Baltimore Library Company; and the first, of the Mercantile Library Association. That the persons named in the act of 1845, ch. 122, have not under it, or under the deed of June 1846, any possession of or control over the building; that there is a body of six gentlemen selected, two from each of said societies, denominated a council of government, whose duties are of a police character entirely. That the first named society is composed of members who became such by election, by those already members, and payment of an annual subscription of $5; the second, of members of three descriptions: 1st, those who pay $100, become life members free of all obligation to make future payments; 2nd, those who purchase a share, become members subject to an annual payment of $5; and 3rd, those who pay $8 *per annum*, without becoming stockholders. The third, of members of two classes: 1st, active members, who pay $3 per annum; and 2nd, honorary members, who pay $5 *per annum*. That the annual expenses of the building, amounting to $900, are paid in equal portions by the three societies; that lectures are occasionally delivered before the first named society by members and by persons from other cities; and that said society has, also, annual addresses delivered by one of its members, but these are delivered not in the building, but at some other place and are open to the public.

The plaintiff then proved that the Maryland Historical Society has a room in said building, arranged and adapted for a gallery of paintings, and that annual exhibitions of paintings have been held in said room: the paintings exhibited belonged to persons who lent them to the society for the time being; that from these exhibitions certain profits have been derived, which the society has expended in the purchase of paintings; that they already have two at a cost of $1000 each, and have ordered three more.

The defendant then offered in evidence a lease dated 12th of February 1848, to the Mercantile Library Association of Baltimore, of the rooms on the first floor of the building, for nine hundred and ninety-nine years, renewable forever, at the yearly rent of one cent; if demanded, upon condition that said association shall pay one-third of the expenses of preserving, insuring, repairing and taking care of the building and the lot, and that the leased premises shall not be used by any person or association other than the lessee, and only by it for the legitimate purpose of its charter, and shall not be assignable by the lessee, and if used contrary to this condition, or shall be assigned by the lessee by operation of law, then the lease shall *ipso facto* cease, the lessee's interest become extinct, and the leased premises vest in the Atheneum for the benefit of the Baltimore Library Company and the Maryland Historical Society. The plaintiff then asked two instructions to the jury, in substance as follows:

1st. If they find defendant's subscription as given in evidence, and that other persons before and after him subscribed for various sums, which were obtained by the efforts of the collecting committee, extending over more than a year, and of these subscriptions more than $25,000, has been paid to the plaintiff, and applied for the purchase of a lot in the city of Baltimore, and the erection thereon of a building for the Atheneum; and that said building was constructed for the accommodation and benefit of the Baltimore Library Company, and the Maryland Historical Society, and since its completion has been occupied by these institutions, to contain their libraries and reading rooms, and likewise by the Mercantile Library Association; and that on the 6th of June 1848, after the sum of $25,000 had been fully subscribed as aforesaid, the resolution of the building committee of that date was adopted, and notice thereof given to the defendant, and that the plaintiff was named as treasurer in the subscription book to which defendant subscribed his name: then there is sufficient evidence of a consideration for the promise

of the defendant, contained in his said subscription, to support an action.

2nd. If they find the facts contained in the first prayer, and that the person who procured defendant's subscription informed him at the time that the object of those who were to subscribe for the erection of an Atheneum, was to accommodate exclusively the Baltimore Library, the Historical Society, and the Mercantile Library Association; and that said subscriptions were to be donations without any pecuniary return; and that a building has been erected for such associations, and has been paid for out of the subscriptions of others; and that said institutions are exclusively accommodated in said building, and have connected with them therein libraries and reading rooms; and that the Historical Society has a gallery of fine arts, and that persons from time to time read papers before it on historical and kindred subjects, and deliver annual addresses which are open to the public: then the plaintiff is entitled to recover the sum subscribed by defendant, with interest from the 18th of August 1848.

The defendant then asked two additional instructions in substance as follows:

5th. That unless the jury shall find from the evidence, that the uses and purposes to which, by the provisions of the deed of June 1846, the property thereby conveyed was limited, were the erection of an Atheneum, the plaintiff is not entitled to recover.

6th. That if they find that defendant at the time he made his subscription, was assured and informed that the Mercantile Library Association, was to be, and should be, accommodated with a room in the proposed Atheneum free of rent, and that he subscribed on the basis of such representations, relying on the performance of the said assurance, and that by the provisions and regulations actually made and existing, said association has not been provided with any room for the accommodation of their library, except under the provisions of the lease of the 12th of February 1848, then the plaintiff is not entitled to recover.

The court granted the plaintiff's first prayer, rejected his second; and also granted the first, but refused the second of the defendant's last two prayers. To the granting of the plaintiff's first prayer and the refusal to grant the second of his last two prayers, the defendant excepted, and the verdict and judgment being against him appealed.

The cause was argued before ECCLESTON, MASON and TUCK, J.

*Richard J. Gittings* and *Cornelius McLean* for the appellant.

The first count in the declaration, is the only one which can be relied on, because where there is a special contract and a special count upon it, there can be no departure from it, and no recovery upon the common counts. 6 *H. & J.*, 84, *Speake vs. Sheppard.* The cause too must be decided upon the plain principles of law, which this court will not attempt to get rid of, for the purpose of meeting what, by the insinuations thrown out upon the other side, is called a hard case, for such cases make shipwreck of the law. We insist then:

1st. That the undertaking by the parties who obtained the subscription of the appellant, was altogether too uncertain and indefinite to form the subject matter of a valid contract. There is no element of a contract in the subscription book: neither parties, subject matter, nor consideration. 1st. The party *payee* is not pointed out, no one is named to receive the money. 2nd. There is no *certain* subject matter of the contract. *Chitty on Contracts*, 72. The term *Atheneum* is *too vague.* Lexicographers all differ in their definition and description of it, and which, is this court to say, was in the minds of these parties?

2nd. But if not void for uncertainty, the subscription was not founded upon a *sufficient consideration* to be enforced in a court of law. To constitute a consideration there must be some legal detriment to the promissee, and a legal benefit to the promissor. *Smith on Contracts*, 87. And if done as a benefit to the party it must be done at *the request* of the defend-

ant. What was the consideration here? It was not the *building* of the Atheneum, for the promise was to be performed before the building was begun. There was no promise to build the Atheneum. None to get subscriptions. The promises, as between the subscribers, were not mutual nor concurrent, but each was separate and independent. That no suit could be maintained on the *subscription itself*, see 9 *Mass.*, 254, *Boutell vs. Cowdin.* 11 *Do.*, 113, *Limerick Academy vs. Davis.* 14 *Do.*, 172, *Farmington Academy vs. Allen.* 2 *Pick.*, 579, *Bridgewater Academy vs. Gilbert.* 1 *Comstock*, 581, *Hamilton College vs. Stewart*, and the same case in 2 *Denio*, 403.

But again, the consideration *must move from the party suing.* A stranger to the contract cannot sue. *Chitty on Contracts*, 54. 24 *Eng. C. L. Rep.*, 96, *Price vs. Easton.* 1 *Excheq. Rep.*, 454, *Jones vs. Robinson.* 5 *Adol. & Ellis*, 548, *Liby vs. Hays.* 1 *Camp.*, 370, *note*, *Waring vs. Cox.* 9 *Eng. Law & Eq. Rep.*, 321, *Kilham vs. Collier.* 20 *Do.*, 129, *Gerhard vs. Bates.* 5 *Mass.*, 491, *Gilmore vs. Pope.* There was clearly no consideration moving from this plaintiff. Again, mutual and concurrent promises are not alleged, which must be done, and with particularity, if it is intended to rely upon them. *Chitty on Contracts*, 63, *note* 1. 8 *G. & J.*, 311, *Steam Navigation Co., vs. Dandridge.* 3 *H. & J.*, 383, *Walsh vs. Gilmor.* 6 *Do.*, 81, *Speake vs. Sheppard.* This question also involves the *bona fides* of the original transaction; that is, the design and intention of the parties when they obtained the subscription, because if they designed to give the money to these societies it was a fraud upon the appellant. Tiffany's testimony does not go to the extent of showing that Gittings knew these societies were to have the building; he only says they were to be *accommodated*, which could have been done, and the public not denied the benefit of the building, without giving these societies the exclusive legal control over it. There is no proof that Gittings knew any thing of this application of the money, and that these societies were to have control of the building and the property, as the deed

in its recitals sets out. There is no proof of acquiescence in the erection of the building subsequent to the contract

3rd. If the original purpose was fair and *bona fide*, such a misapplication of the funds has been made, as releases the appellant from his promise. This involves the character of the whole proceedings after the subscriptions; the binding effect of the act of Assembly, and the right to devote what was liberally designed for the public, to the use of private incorporations, through whom, and in the way determined by whom, and to the extent agreed upon by whom alone, can the public enjoy the bounty of the appellant. 3 *G. & J.*, 435, *Sothoron vs. Weems.* We say the act of 1845, ch. 122, was a total diversion of the fund. The deed shows that the object, from the beginning, was to put a new house over the heads of these two corporations, whereas, Mr. Gittings had the right to infer that the building was to be for the benefit of the public, who would be profited by its erection.

4th. The contract *proved* differs from that charged in the declaration, and unless the *allegata* and *probata* agree, there can be no recovery. 3 *H. & J.*, 383, *Walsh vs. Gilmor.* Parol evidence will not be admitted *to explain* the written contract. 4 *New Hamp.*, 533, *George vs. Harris.*

5th. If there was a sufficient consideration to support the promise, and if there has been no such misappropriation of the funds as to avoid it, still the *present plaintiff* cannot maintain this action. This question has already been discussed in fact under the second point. In addition to the authorities there cited, see *Chitty on Contracts*, 211, 212. 8 *Eng. C. L. Rep.*, 28, *Holmes vs. Higgins.* 3 *Barn. & Ald.*, 276, *Sargent vs. Morris.* He cannot sue as agent of the building committee, (*Chitty on Pl.* 4, 5,) for an agent can never sue in his own name except where he has made the contract for himself, or has an interest antagonistic to his principal. What interest had Mayhew in the fund when he brought the suit? There was no promise to pay him, and even if he was the agent of the building committee his functions ceased after the building was erected. There is no

proof that he was agent of the Atheneum. Again, there was no sufficient call made upon or notice given to the defendant, the original committee having been changed, and but four being present when it was made. 59 *Eng. C. L. Rep.*, 691, *Woolmer vs. Toby.* 39 *Law Lib.*, 200. 3 *Bos. & Pul.*, 147, *Piggott vs. Thompson.*

6th. If the Mercantile Library Association was entitled to accommodation, its rights were equal to that of the other companies, whereas under the lease it has only received such privileges and such portions of the building, as the other companies chose to give them after suiting themselves. Again, the deed for the lot provides, that the Baltimore Library may be given up to the Historical Society. What right had they to take such a deed? But where will the property go if both these societies should cease to exist? Of course to the grantors, Wilson and wife.

The main questions in the case, viz., the sufficiency of the consideration, and the right of the plaintiff to sue, are raised by the defendant's first prayer, which is not obnoxious to the objection of being too general, under the act of 1825, ch. 117. See 4 *Gill*, 421, *Stockton vs. Frey.* There is no authority in the United States, of any respectability, which sustains the position that an action can be maintained on this subscription by the present plaintiff. Let us examine some of those relied upon by the other side.

In 6 *Pick.*, 438, the distinction is clearly drawn between it and the prior Massachusetts' cases, like the present, and the suit was brought by the party who was to be ultimately benefited. In 1 *Comstock*, 584, there was a ratification after the work was done. In 4 *New Hamp.*, 533, the agreement was between the subscribers with *each other*, and for their benefit. The subscriptions were made payable to a particular party, and all the other subscribers brought the suit because they were to be benefited. 2 *Verm.*, 65, is distinguishable from this, and in the course of the argument a case like this, where there is no payee, is commented upon. 11 *Mass.*, 118, suggests, that after the contract is executed a *quantum meruit*

may be brought by the party ultimately to be benefited. But after the contract is executed, the agent who obtained the subscriptions has no interest in the money. In 1 *Metcalf*, 568, the contract is peculiar in its terms, and is in no way like this. It amounted to a positive contract between the subscribers, and the suit was brought by the *payee* in the contract. In 11 *Ohio*, 452, the subscription expressly provides that it was for the benefit of the subscribers, and the party to whom the money was to be paid, brought suit. 5 *Pick.*, 508, draws the distinction between the new and the old cases, and shows that in the former there was an obligation upon the promissee to fulfil the contract. 3 *Scammon*, 200, was a case of mutuality of contract between the subscribers. In 2 *Humphreys*, 325, the party benefited sued the party agreeing to give. In 8 *B. Monroe*, 68, the trustees sued, and the court say there were mutual liabilities; but that case cannot stand as law, because there was a total failure of consideration. 6 *Metcalf*, 317, draws the distinction before referred to, and a payee was designated. In none of these cases has any person been allowed to be plaintiff, except he was named in the subscription as payee, or appointed by the subscribers, or had a substantial interest in the fund, or unless the contract was executed and the party was allowed to sue upon a *quantum meruit*. But in this case Mayhew had no interest in the fund, and there was no promise to pay him.

*Frederick W. Brune* and *George W. Brown* for the appellee.

1st. This court cannot consider the first prayer of the appellant, because it does not involve any point or question which appears upon the record to have been raised or made in the court below within the meaning of the act of 1825, ch. 117. It states that, "the evidence does not show a state of case as forms a *legal basis* of such a promise as the plaintiff has alleged in pleading." Now what does "*legal basis*" mean? It means anything and *everything*—it raises no point. See 2 *G. & J.*, 306, *Davis vs. Leab*. 3 *Do.*, 376, *Penn vs. Flack*. 5 *Do.*, 102, *Sasscer vs. Walker*. *Ibid.*, 491, *Grahame vs. Harris*.

2nd. The defendant's subscription, under the circumstances of the case, constitutes a contract which can be enforced in this action. Parol testimony was properly admitted to explain the nature of these circumstances. 1 *Greenlf. on Ev.*, secs. 275, 286, 288. It was admitted without objection, relied upon by the defendant, and he cannot now say it is inadmissible to the full extent to which it goes. 7 *G. & J.*, 95, *Farmer's Bank vs. Duvall*. Mr. Gittings had notice of the object of the undertaking for which his subscription was obtained, and it is a contract which it would be a reproach to the judicature under which we live, if it could not be enforced. The general policy of the law favors such subscriptions, and they ought to be enforced by the courts.

It has been said the subject matter of the contract is too indefinite, but this is not so. It is a promise to pay money for the erection of a building to be called " *The Atheneum*," and the jury in the trial of the case below, after full argument and examination, decided that the building erected was *an Atheneum*. Again, it is said that there is not a sufficient consideration for the contract. This question of consideration upon such a subscription as this, is raised for the first time in this State by this defendant. We insist that there was a sufficient consideration for the contract, upon various grounds. The undertaking to get subscriptions to the amount required, was an ample consideration for the promise of each subscriber. Subscription to a common object makes a sufficient consideration. 13 *Ves.*, 148, *Crosbie vs. McDoual*. 7 *Johns.*, 112, *Society in Whitestown vs. Stone*. 2 *Denio*, 416. 5 *Pick.*, 508, *Trustees, &c., vs. Stetson*. 4 *New Hamp.*, 535, *George vs. Harris*. 6 *Do.*, 164, *Society in Troy vs. Perry*. 7 *Do.*, 435, *Cong. Soc. of Troy vs. Goddard*. 12 *Mass.*, 190, *Holmes vs. Dana*. 14 *Do.*, 171, *Farmington Academy vs. Allen*. 12 *Pick.*, 543, *Williams College vs. Danforth*. The construction of the building was also a sufficient consideration. 20 *Johns.*, 89, *McAuley vs. Billenger*. 1 *Comstock*, 582 to 585. 2 *Denio*, 422 to 425. *Saunders on Pl. & Ev.*, 147. See, also, as to the sufficiency of the consideration, 6 *Pick.*, 437, *Amherst*

*Academy vs. Cowls.* 3 *Scammon,* 200, *Robertson vs. March.* 2 *Verm.,* 53, *University of Vermont vs. Buel.* 9 *Do.,* 293, *Treasurer vs. Cross.* 2 *Humphreys,* 338, *Macon vs. Sheppard.* 3 *Barr.,* 417, *Caul vs. Gibson.* 5 *Ohio Rep.,* 58, *Canal Commissioners vs. Perry.* 6 *Greenlf.,* 442, *Parsonage Fund vs. Ripley.*

3rd. The plaintiff was entitled to maintain this action. On this point, in addition to the authorities above cited, see 3 *Woodbury & Minot,* 338, *Heckscher vs. Binney.* There was a special promise to the plaintiff as treasurer—the names of the building committee and *the treasurer* were on the subscription book, and this was known to the defendant. The subscription is to pay in such instalments as the building committee may require, and they have required the treasurer to enforce the payment. See also 1 *Metcalf.,* 569, 570, *Thompson vs. Page.* 3 *Pick.,* 325, *Fisher vs. Ellis.* 1 *Selw. N. P.,* 32. 11 *Mass.,* 113, *Limerick Academy vs. Davis.* 2 *Smith's Lead. Cases,* 158, in 23 *Law Lib., Thompson vs. Danforth. Story on Agency, sec.* 393. But this point, that the plaintiff had no right to sue, is not raised by any of the prayers, and is not before this court.

4th. None of the other objections urged to the recovery are available. The consideration has not failed, and there has been no diversion of the fund. The building was an Atheneum, and was so found by the jury; the call for his subscription was duly and regularly made upon the defendant, and there is full proof that the Mercantile Library Association have been accommodated with a room in the building free of rent. The court below, therefore, committed no error in its several rulings. The plaintiff's second prayer has no meaning. The strict and grammatical meaning of the words are, that the subscription of the defendant created no legal liability upon the *plaintiff* capable of enforcement at the suit of the plaintiff. The plaintiff is not bringing suit against himself.

TUCK, J., delivered the opinion of this court.

It is not necessary to express an opinion upon all the pro-

17     v.6

positions presented by this record. But, as some of them are particularly interesting to the community in which this contest arose, it is proper, after the full consideration they have had by counsel, that they should be decided. We pass by the objections made to the generality of the first prayer, in view of the act of 1825, ch. 117, because, if they availed against that prayer, the point on which the judgment must be reversed is presented distinctly by the *fourth* prayer, and also by the *second*, if, (as we think we should in this case,) the court discard the strict grammatical construction placed upon it by the appellee's counsel, and give to it that interpretation which we have no doubt it received in the trial below. The questions we propose to consider are, as to the validity of agreements like the present, and the proper party to enforce them.

It was insisted, on the part of the appellant, that the plan and terms of the agreement are so vague and uncertain, that the law will not recognize any obligation to pay this money. In other words, that they do not amount to a contract in law. And, *first*, it is said that the term "Atheneum" conveys to the mind no definite idea, and that the alleged contract is void for the want of a sufficient and certain subject. We are not to determine questions of this kind according to the uses to which such buildings were devoted among the ancients. The meaning of this term was well known among the Greeks and Romans as designating a public place where professors of the liberal arts held their assemblies, rhetoricians declaimed, and poets recited. In modern days, however, the name has been frequently bestowed upon establishments connected with literature, science, and the arts, whether devoted to one or more branches of learning. There are many such institutions in this country. Probably no two of them are the same in origin, design or government, yet each, looking to its character and object, may very appropriately be called an Atheneum. We do not consider this a sufficient objection to the validity of the subscription.

It was also urged, that even if the term "Atheneum" be sufficiently definite, there was no consideration for the agree-

ment. The effect of undertakings of this kind has been considered in many of the courts of this country; they have not been always enforced, but where the actions have failed it has been, generally, on some purely technical ground, and not because such promises were deemed merely gratuitous, and not the subject matter of suits at law. In some cases the courts, in furtherance of what they deemed a recognized public policy, have felt themselves warranted in relaxing, to some extent, the rigor of the common law, and have held the subscribers liable, when, perhaps, upon strict principles, there was not a legal consideration for the contract. The maintenance of such institutions is certainly of the highest merit. Whether projected for literary, scientific or charitable purposes, they address themselves to the favorable consideration of those whose success in life may have enabled them, in this way, to minister to the wants of others, and at the same time promote their own interests, by elevating the character of the community with whose prosperity their fortunes may be identified. Indeed, considering the number of these institutions, erected and maintained by private munificence alone, the cases are very rare in which subscribers have refused compliance with their engagements. Instances may occur in which parties, feeling themselves released in consequence of a failure of expectations reasonably entertained at the time of making the subscription, might avail themselves of legal defences without justly forfeiting the good opinion of those who embarked with them in the enterprise. The propriety, however, of employing such means of resisting payment the parties must determine for themselves. Upon that portion of the present case, therefore, so much contested at the bar, we decline expressing any opinion.

In whatever uncertainty the law concerning voluntary subscriptions of this character may be at this time, in consequence of the numerous decisions pronounced upon the subject, it appears to be settled, that where advances have been made, or expenses or liabilities incurred by others, in consequence of such subscriptions, before notice of withdrawal,

this should, on general principles, be deemed sufficient to make them obligatory, provided the advances were authorized by a fair and reasonable dependence on the subscriptions. 1 *Parsons on Contracts,* 378.   *Story on Contracts,* sec. 453.   The decisions have certainly gone to this extent— many of them much further—in sustaining actions on such agreements, as the cases cited in the argument show.   The doctrine is not only reasonable and just, but consistent with the analogies of the law.   We cannot doubt that the present appellant made himself responsible for the amount claimed, according to this view of the law.   The parties to the plan agreed to pay, when a certain amount should be subscribed, in instalments to be required by the building committee.   That amount was subscribed, instalments were called in from time to time by the committee ; they made contracts, and under their authority and management, and in reliance upon the good faith of the subscribers, the Atheneum was completed. Having by his signature, authorized others to enter into engagements for the accomplishment of the enterprize, the law requires that he should save them harmless to the extent of his subscription.

But here a question arises as to the right of this plaintiff to sue.   This branch of the subject has elicited much discussion.   The cases referred to, without asserting a principle, have generally been decided according to their peculiar circumstances, the plaintiffs having been required to bring themselves within the principles heretofore indicated as governing actions of this character.   If in some, as was contended, recoveries have been had in the name of parties possessing no stronger claim to sue than the present appellee, it is to be observed, also, that in others equally as favorable, the right has been denied.   Without particularly examining the authorities it may be remarked, that in those cited on this point, in behalf of the plaintiff below, the defendants had agreed to pay their contributions to the plaintiffs, as the party named in the agreement, or afterwards selected in the manner therein indicated for the purpose of receiving the money; or the

plaintiffs had, by causing the proposed work to be done on their means or credit according to the reasonable intent of the agreement and in reliance on the subscriptions, made the defendant liable to them for the amount subscribed; and especially in those cases where the party charged had acted on the agreement or acquiesced in what the plaintiffs had done under it. 20 *Johns.*, 89. 11 *Mass.*, 118. 3 *Pick.*, 322. 6 *Pick.*, 427. 1 *Metcalf*, 565. 6 *Do.*, 315. 14 *Mass.*, 172. 3 *Scammon*, 199. 3 *Barr.*, 416. We cannot perceive that the appellee is within the reason of the rule applicable to such cases as these. If there had been no act of incorporation, the right to sue would have been in the building committee, as the persons authorized by the agreement to call in the payments, and, as their office imported, to make contracts and do all else that was necessary for the erection of the proposed building, which office they had performed. It is true that the appellee was named in the lists as the treasurer, but the building committee was also designated in the lists, and, moreover, they were expressly named in the agreement, and thereby recognized by the parties, as the persons authorized to call in, control, and disburse the funds. Besides, there was a committee on collections also named, and if either person or class of persons became entitled to sue, merely by the fact of having been named in the lists prefixed to the agreement, there is no more reason for clothing the treasurer with this authority, by implication, than there was for assigning it to the committee on collections as part of their duty. It was contended that the resolution of the building committee of the 8th June 1848, authorized the appellee to sue for the recovery of the subscriptions. In this we do not concur. The committee might have appointed other collectors, and as many as might have been deemed necessary, but such appointment would have made them only agents to collect and not necessarily have clothed them with power to sue. We cannot consider the appellant in any other character than as the custodiary of the funds, with power to disburse them upon the orders of the committee. There was

a manifest propriety in placing his name with the others on the lists, because, as this enterprize was to depend on private munificence, it was important that the persons who might be solicited to subscribe, should know that the execution of the plan was to be confided to persons of character and standing. We presume it was the design of this arrangement to challenge the confidence of the community, and induce them to subscribe, not to designate the treasurer as the party with whom the contributors were entering into a contract.   Whether the subscribers were liable after the charter was obtained, and on whom the right of action devolved, would depend on their agency in procuring the charter, or on their having assented thereto, or acquiesced in the proceedings of the corporators, looking to the consummation of the plan originally contemplated by the subscribers.   This view of the case is fully discussed in *Limerick Academy vs. Davis*, 11 *Mass.*, 113, where, as we think, the law is announced on correct principles.

The objects proposed by the friends of this institution, as imposing on all the parties a high moral obligation, were forcibly presented in answer to the legal defences set up by the appellant.   It too often happens that judgments according to the law do not subserve the purposes of justice.   But this the courts have no power to remedy.   It is safer that a private right should fail, or a wrong go unredressed, than that settled principles should be disregarded in order to meet the equity of a particular case.   Not finding any warrant in the law for sustaining this action in the name of the appellee, the judgment must be reversed *without procedendo*.

<em>Judgment reversed and procedendo refused.</em>