## MARYLAND NATIONAL BANK ET AL. *v.* UNITED JEWISH APPEAL FEDERATION OF GREATER WASHINGTON, INC.

[No. 30, September Term, 1979.]

*Decided November 6, 1979.*

The cause was argued before MURPHY, C. J., and SMITH, ELDRIDGE, ORTH and COLE, JJ.

*Paul Mannes,* with whom was *Richard S. McKernon* on the brief, for appellants.

*Glenn M. Cooper,* with whom were *Paley, Rothman, Cooper & Eig, Chartered,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

The issue in this case is whether a pledge to a charitable institution survives the death of the pledgor and is an enforceable obligation of his estate.

I

Milton Polinger pledged $200,000 to the United Jewish Appeal Federation of Greater Washington, Inc. (UJA) for the year 1975. He died on 20 December 1976. His last will and

testament was admitted to probate in the Orphans' Court for Montgomery County and letters were issued to Melvin R. Oksner and Maryland National Bank as personal representatives.[1] At the time of Polinger's death $133,500 was unpaid on his pledge. The personal representatives disallowed the claim for the balance of the pledge. UJA filed a petition praying that the claim be allowed and moved for summary judgment.[2] The personal representatives answered and filed a cross-motion for summary judgment. The court granted UJA's motion for summary judgment, denied the personal representatives' motion for summary judgment, allowed UJA's claim against the estate in the amount of $133,500, and assessed the costs against the personal representatives. The personal representatives noted an appeal to the Court of Special Appeals and petitioned this Court to issue a writ of certiorari to that court before decision by it. We did so.

## II

The facts before the court were undisputed in material

---

1. Since the latter part of 1966 "[t]he several judges of the Circuit Court for Montgomery County ... shall each, alternately and in rotation and on schedules to be established by the said judges, sit as an Orphans' Court for said County, and shall have and exercise all the power, authority and jurisdiction which the present Orphans' Courts now have and exercise, or which may hereafter be prescribed by law." Md. Const. Art. IV, § 20. Thus, contrary to what seems to be the general impression, the Circuit Court for Montgomery County does not sit as an Orphans' Court.

2. The authority for the summary judgment was stated to be Maryland Rule 610. That rule applies "to procedure generally, both at law and in equity," Rule 1 a 1, but authorizes a party asserting a claim or a party against whom a claim is asserted to make a motion for a summary judgment in "an action." Rule 610 a 1. " 'Action' shall include all the steps by which a party seeks to enforce any right in a court of law or equity," and "an appeal from the final decision of ... an Orphans' Court. ..." Rule 5 a. An Orphans' Court is not a court of law or equity nor were the summary judgment motions here made on an appeal from a final decision of an Orphans' Court. It appears, therefore, that summary judgment was not the proper procedure to follow regarding the matter of the claim. But there was no dispute of any material fact, and the question was one only of law. The Orphans' Court for Montgomery County did decide the matter with no question raised with respect to the procedural course it followed. To save time and expense of all concerned we shall proceed to decide the case despite procedural deficiencies.

part.[3] They showed the nature of UJA and its relationship with its beneficiaries. UJA, chartered in the District of Columbia, is a public non-profit corporation. In general, its objective is to solicit, collect and receive funds and property for the support of certain religious, charitable, philanthropic, scientific and educational organizations and institutions, and it enjoys tax exempt status federally and in Maryland, Virginia and the District of Columbia. Based on monies received and pledged, it makes allocations to tax exempt organizations. No formal commitment agreement is executed with respect to the allocations, but UJA undertakes to pay pursuant to the allocation and the beneficiary organizations "go ahead to act as though they are going to have the money and they spend it." In other words, UJA makes allocations to various beneficiary organizations based upon pledges made to it, and the beneficiary organizations incur liabilities based on the allocations. Historically 95% of the pledges are collected over a three year period, and allowance for the 5% which may be uncollected is made in determining the amount of the allocations. So, according to Meyer Brissman, Executive Vice-President Emeritus of UJA: "We always pay [the allocated amount]. I don't know of any case where we haven't paid." Pledges to "emergency funds" are not paid on the basis of an allocation by UJA. All monies actually collected on those pledges are paid to the emergency funds.

The facts before the court showed the circumstances surrounding the pledge of Polinger with which we are here concerned. It was evidenced by a card signed by Polinger under date of 9 November 1974. It recited:

> In consideration of the obligation incurred based upon this pledge, I hereby promise to pay to the United Jewish Appeal the amount indicated on this card.

The amount indicated as his "1975 pledge" was $100,000 for

---

3. Inasmuch as the court followed procedures applicable to summary judgment, facts were placed before it by affidavits, deposition, admissions in the pleadings and stipulation or concession. *See* Washington Homes v. Inter. Land Dev., 281 Md. 712, 715-718, 382 A.2d 555 (1978).

"UJA including local national and overseas," and $100,000 for "Israel Emergency Fund."

UJA organized a "mission" to Israel in the fall of 1974. The mission was in no sense a tour. It was at the time of the missile crisis in Israel, and the members of the mission were to meet with Golda Meir, then Prime Minister, and with other government leaders to be briefed on the problems the country faced. It was to be involved with "people in the troubled settlements." Certain community leaders, including Polinger, went on the mission. Polinger had been active in the affairs of UJA and had regularly made substantial contributions to it.

"Pre-solicitation" is a process whereby it is determined who can be expected to make large pledges and specifically who will likely substantially increase their pledges of previous years. Pre-solicitation is part of a well conceived plan to obtain large contributions. It leads to a "high-pressure meeting" at which, according to Brissman,

> [t]here is no question that the technique is the interchange and people knowing everyone else in the room, and if this one is thinking of a need of being so great as to be willing to do something unusual, the others thought it was similarly important for them to demonstrate it.

The idea is that "if somebody thought it was important enough to give more than he gave before, [others would think] that they ought to give more, and they [give] more money. . . . [W]e get together and discuss reactions to what they have seen, what the needs are, and people sometimes make a speech before they decide what they are going to say about the money, and it is a free-flowing thing, and nobody knows in advance what anybody is going to say, but some of the people are talked to one by one privately to condition them to make some kind of a special response to influence the group. The whole purpose of fund raising is to get an example."

Polinger was selected to be an example on the Israel

mission. He had pledged $65,000 for 1973. He had "participated willingly" in such a meeting in connection with the 1974 fund raising campaign and had pledged $150,000. He was one of those it was "felt was ready to do something unusual. . . ." He was pre-solicited by three or four individuals and went up to two hundred thousand dollars for 1975. It was agreed that his pledge would be made in a "caucus" at the King David Hotel in Jerusalem. The caucus was held and Polinger "came into the caucus," as Brissman said, "so we could announce all the gifts and influence other people of different levels." Polinger was to be a "pacesetter."

There were about thirty men at the caucus. About four of them had pledged an amount as large as $200,000 before Polinger made his announcement. Brissman thought that "there was an emotional impact that develops when a man has seen things that influence him to believe that there is something desperate and earth-shaking going on and he could do something about it beneficially, and he responds." When Polinger said he would give $200,000, he indicated that he wanted everybody to give as much as they could. He thought he was giving the greatest amount that he possibly could find himself able to so do. Of course, Polinger was only one of many people who spoke and made a pledge. Whether anyone in fact increased his pledge because of Polinger was never discussed at the meeting, and Brissman was unable to say whether anyone was influenced by Polinger's pledge.

> It is just a dynamics of an involvement where after two weeks of being together night and day in a setting of that kind after a major war, meeting with individuals who lived through three or four such wars, that everybody is strung out and you are like a family, and in the process of interchange, speeches are made, and maybe somebody made a gift of $5,000.00 influenced people just as much as the man who gave $200,000.00 because of what the money meant in their view of this person's ability to give.

> It is just not the biggest number, but it is the concept of response to a need that these people are

reacting to. And I don't know that you verbalize it in that way necessarily, but it does come out that one influences another in the interchange, because you are going around a room and everybody is talking about how they were moved by what they were into. So there is no question one influences another.

Brissman was asked "whether aside from the specific group of people who were present in Israel with Mr. Polinger, are there any other people here in the Washington area or anywhere else that you are aware of who made pledges, gifts, or increased gifts as a result of Mr. Polinger's gift?" He could not say. He could only give the procedure followed:

I solicited personally hundreds of people, some face to face, some by telephone, some by appointment with two or three people talking to an individual. And frequently I, personally, and I know of others who do likewise, start to tell people what kind of response we are getting when we get to the question of what is a standard for giving, or what you ought to consider as your share, and in the process I have used Milton Polinger as an example talking to individuals. They know who Milton is. And I would tell them what Milton had done in 1973 and in 1974 in trying to get them to respond in some way to move further ahead in their extension as far as they can, because we are talking of stretching. If you can give so much, can you give a little bit more type of thing, and I frequently would use Milton as an illustration.

There is no question in my mind when I do it I know others do it, and I have seen at the time that we are talking about people reporting on the mission to others who were not there, soliciting gifts at meetings or in individual confrontations, telling what happened at the mission, and they would go down line by line everybody who made gifts, they had a list in front of them as a tool.

So it was used. There is no question about it. I

cannot tell you this one increased his gift only because of that one's response, but it is part of a package. That is how you raise money.

## III

We find that the law of Maryland with regard to the enforcement of pledges or subscriptions to charitable organizations is the rule thus expressed in the Restatement of Contracts § 90 (1932):

A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

We reach this conclusion through opinions of this Court in four cases, *Gittings v. Mayhew,* 6 Md. 113 (1854); *Erdman v. Trustees Eutaw M. P. Ch.,* 129 Md. 595, 99 A. 793 (1917); *Sterling v. Cushwa & Sons,* 170 Md. 226, 183 A. 593 (1936); and *American University v. Collings,* 190 Md. 688, 59 A.2d 333 (1948).

*Gittings* concerned the building of an Atheneum. The subscription contract authorized the calling of payment of installments by the subscribers when a certain amount had been pledged. The amount was reached, installments were called for and paid, contracts to erect the building were made and the Atheneum was completed. It was in these circumstances that the Court said:

In whatever uncertainty the law concerning voluntary subscriptions of this character may be at this time, in consequence of the numerous decisions pronounced upon the subject, it appears to be settled, that where advances have been made, or expenses or liabilities incurred by others, in consequence of such subscriptions, before notice of withdrawal, this should, on general principles, be deemed sufficient to make them obligatory, provided the advances

> were authorized by a fair and reasonable dependence
> on the subscriptions. . . . The doctrine is not only
> reasonable and just, but consistent with the
> analogies of the law. [6 Md. at 131-132.]

This statement of the law appeared to be *obiter dictum* in *Gittings*,[4] but if it were, it became the law in *Erdman.*

*Erdman* dealt with a suit on a promissory note whereby there was a promise to pay the Eutaw Methodist Protestant Church the sum of $500 four years after date with interest. The consideration for the note was a subscription contract made with the trustees of the church for the purpose of paying off a building debt, which had been incurred for the erection of a new church building. It had been entered on the books of the church, the trustees had subsequently borrowed $2,000 on that subscription and other subscriptions to pay off the indebtedness for the erection of the church building. The Court held that in such circumstances the subscription contract was a valid and binding one and constituted a sufficient consideration to support the note, *id.* at 602, observing that "[t]he policy of the law, to sustain subscription contracts of the character of the one here in question, is clearly stated by this Court, and by other appellate Courts, in a number of cases, *id.* at 600. The only Maryland case cited was *Gittings.* The holding in *Gittings* was said to be "that as the party had authorized others by the subscription to enter into engagements for the accomplishment of the enterprise the law requires that he should save them harmless to the extent of his subscription." *Erdman,* 129 Md. at 601. One case in another appellate court was discussed, *Trustees v. Garvey,* 53 Ill. 401 (1870) and two cited as to like effect, *McClure v. Wilson,* 43 Ill. 356 (1867) and *United Presbyterian Church v. Baird,* 60 Iowa 237, 14 N.W. 303 (1882). In Garvey the court noted that "[a]s a matter of public policy, courts have been desirous of sustaining the legal obligation of subscriptions of

---

4. In Gittings v. Mayhew, 6 Md. 113 (1854) the judgment of the court below upholding the validity of the pledge was reversed solely on the ground that the plaintiff was not a proper person to bring the action. *Id.* at 134. The validity of the pledge was discussed only because it was particularly interesting to the community and had been fully considered by counsel. *Id.* at 130.

this character, and in some cases . . . have found a sufficient consideration in the mutuality of the promises, where no fraud or deception has been practiced." *Id.* at 403. "But," the court continued, "while we might be unwilling to go to that extent, and might hold that a subscription could be withdrawn before money had been expended or liability incurred, or work performed on the strength of the subscriptions, and in furtherance of the enterprise," the church trustees had, on the faith of the subscriptions, borrowed money, relying on the subscription as a means of payment and incurred a specific liability. *Id.* Thus, it seems that *Erdman* made law of the dictum in *Gittings,* but that law was that charitable subscriptions to be enforceable require reliance on the subscriptions by the charity which would lead to direct loss to the organization or its officers if the subscriptions were not enforced.

This principle of the law was applied in *Sterling.* In that case pledges were made to support a failing bank, to restore confidence in it and protect its depositors and creditors, to comply with demands of the bank commissioner so as to keep the bank open and to prevent impairment of its capital. There were, therefore, substantial considerations for the subscriptions. "Not only was every subscription expressly made in consideration of the agreement of other subscribers, who have fulfilled their pledges, but a prior subscription agreement was to be, and was, in fact, released to the specified extent, when the new one became binding, and consent of the bank commissioner to the continued functioning of the bank was thereby induced." *Id.* at 236. In such circumstances, the Court declared: "The sufficiency of such considerations cannot be doubted." *Id.,* citing *Gittings* and *Erdman.*[5]

*Gittings* and *Erdman* were referred to in *American University v. Collings,* 190 Md. 688, 59 A.2d 333 (1948), as cases "which hold that where one has made a subscription and thereby authorized the entering into engagements to

---

5. The Court also cited *Hughes v. Antietam Manuf. Co.,* 34 Md. 316 (1871), but that case concerned stock subscriptions and appears to be factually inapposite.

accomplish the purpose for which the subscription was made, the subscription was upon a valuable consideration." *Id.* at 691. The Court carefully pointed out that "[in those] cases, however, the promisee had actually incurred obligations relying upon the promises," but that in the case it was considering there was no claim "that any such obligations had been entered into." *Id.* The case turned on the finding that the pledge was testamentary in nature. *Id.* at 692. *Compare* the dissenting opinion of Delaplaine, J., 190 Md. at 694-697.

In summary, the rule announced in *Gittings,* referred to in *Collings* and applied in *Erdman* and *Sterling,* is in substance the rule set out in § 90 of the Restatement of Contracts (1932). It is the settled law of this State.

## IV

UJA would have us "view traditional contract law requirements of consideration liberally" in order to maintain what it believes to be a judicial policy of favoring charities. We deeply appreciate the fact that private philanthropy serves a highly important function in our society. This was well expressed by the Court some hundred and twenty-five years ago in observing that the maintenance of charitable institutions was "certainly of the highest merit":

> Whether projected for literary, scientific or charitable purposes, they address themselves to the favorable consideration of those whose success in life may have enabled them, in this way, to minister to the wants of others, and at the same time promote their own interests, by elevating the character of the community with whose prosperity their fortunes may be identified. [*Gittings,* 6 Md. at 131.]

But we are not persuaded that we should, by judicial fiat, adopt a policy of favoring charities at the expense of the law of contracts which has been long established in this state. We do not think that this law should be disregarded or modified so as to bestow a preferred status upon charitable organizations and institutions. It may be that there are cases

in which judgments according to the law do not appear to subserve the purposes of justice, but this, ordinarily, the courts may not remedy. "It is safer that a private right should fail, or a wrong go unredressed, than that settled principles should be disregarded in order to meet the equity of a particular case." *Gittings* at 134. If change is to be made it should be by legislative enactment, as in the matter of the tax status of charitable organizations.

In advocating its position, UJA points to this statement in *Gittings*:

> In some cases the courts, in furtherance of what they deemed a recognized public policy, have felt themselves warranted in relaxing, to some extent, the rigor of the common law, and have held the subscribers liable, when, perhaps, upon strict principles, there was not a legal consideration for the contract. [*Id.* at 131.]

That this was no more than an observation and not an adoption of the principle was made manifest by the further comments of the Court:

> Indeed, considering the number of these [charitable] institutions, erected and maintained by private munificence alone, the cases are very rare in which subscribers have refused compliance with their engagements. Instances may occur in which parties, feeling themselves released in consequence of a failure of expectations reasonably entertained at the time of making the subscription, might avail themselves of legal defenses, without justly forfeiting the good opinion of those who embarked with them in the enterprise. The propriety, however, of employing such means of resisting payment the parties must determine for themselves. Upon that portion of the present case, therefore, so much contested at the bar, we decline expressing any opinion. [*Id.*]

In *Collings* the Court noted that American University had

cited a number of cases from other jurisdictions which, the educational institution stated, "represents the general trend of judicial authority, and it is in accordance with the better reasoned opinion, that contracts for subscriptions or donations to churches or charitable or kindred institutions which have been duly accepted are based upon a valid consideration because of the mutual obligations of other subscribers." *Id.* at 692. But the Court also observed Professor Williston's criticism of this view, citing "1 *Williston on Contracts,* Rev. Ed., § 116." *Id.* In any event, as we have indicated, the Court had no occasion to decide whether the pledge involved in *Collings* was given for a valid consideration.

Restatement (Second) of Contracts (Tent. Draft No. 2, 1965) proposes changes in § 90. It would read:

A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

This deletes from the existing section the qualification "of a definite and substantial character" with regard to the inducement of action or forbearance and has the inducement of forbearance apply to "a third person" as well as the promisee. It also adds the discretionary limitation as to the remedy. Comment c to the proposed Section concerns "[c]haritable subscriptions, marriage settlements, and other gifts." It begins:

One of the functions of the doctrine of consideration is to deny enforcement to a promise to make a gift. Such a promise is ordinarily enforced by virtue of the promisee's reliance only if his conduct is foreseeable and reasonable and involves a definite and substantial change of position which would not have occurred if the promise had not been made.

This reflects the previous section and the Maryland rule. The comment then notes that "[i]n some cases, however, other policies reinforce the promisee's claim." It states:

American courts have traditionally favored charitable subscriptions and marriage settlements, and have found consideration in many cases where the element of exchange was doubtful or nonexistent. Where recovery is rested on reliance in such cases, a probability of reliance is likely to be enough, and no effort is made to sort out mixed motives or to consider whether partial enforcement would be appropriate.

Illustration 7 is of a charitable subscription:

A orally promises to pay B, a university, $100,000 in five annual installments for the purposes of its fund-raising campaign then in progress. The promise is confirmed in writing by A's agent, and two annual installments are paid before A dies. The continuance of the fund-raising campaign by B is sufficient reliance to make the promise binding on A and his estate.

Section 90 of the tentative draft No. 2 of the Restatement (Second) of Contracts, 1965, has not been adopted by the American Law Institute, and we are not persuaded to follow it.

"Cases throughout the country clearly reflect a conflict between the desired goal of enforcing charitable subscriptions and the realities of contract law. The result has been strained reasoning which has been the subject of considerable criticism." *Salsbury v. Northwestern Bell Telephone Company*, 221 N.W.2d 609, 611-612 (Iowa, 1974). When charitable subscriptions, even though clearly gratuitous promises, have been held either contracts or offers to contract, the "decisions are based on such a great variety of reasoning as to show the lack of any really sufficient consideration." Williston on Contracts, § 116 (3d ed. 1957) (footnotes omitted). "Very likely, conceptions of public policy

have shaped, more or less subconsciously, the rulings thus made. Judges have been affected by the thought that 'defenses of [the] character [of lack of consideration are] breaches of faith towards the public, and especially towards those engaged in the same enterprise, and an unwarrantable disappointment of the reasonable expectations of those interested.' " *Allegheny College v. National Chautauqua County Bank*, 246 N.Y. 369, 159 N.E. 173, 175 (1927). Therefore, "[c]ourts have . . . purported to find consideration on various tenuous theories. . . . [The] wide variation in reasoning indicates the difficulty of enforcing a charitable subscription on grounds of consideration. Yet, the courts have generally striven to find grounds for enforcement, indicating the depth of feeling in this country that private philanthropy serves a highly important function in our society." J. Calamari & J. Perillo, The Law of Contracts, § 6-5 (1977) (footnotes omitted). Some courts have forthrightly discarded the facade of consideration and admittedly held a charitable subscription enforceable only in respect of what they conceive to be the public policy. *See, for example, Salsbury v. Northwestern Bell Telephone Company, supra; More Game Birds in America, Inc. v. Boettger,* 125 N.J.L. 97, 14 A.2d 778, 780-781 (1940).

We are not convinced that such departure from the settled law of contracts is in the public interest. A charitable subscription must be a contract to be enforceable, unless we characterize it as some other type of agreement, unknown to established contract law, for which a valid consideration is not essential. We said in *Broaddus v. First Nat. Bank,* 161 Md. 116, 155 A. 309 (1931):

> It is unnecessary at this time to cite authorities in this state and elsewhere to the effect that every contract must be supported by a consideration; and this must be regarded as one of the elementary principles of the law of contract. [*Id.* at 121.]

And, we recently cited *Broaddus* in *Peer v. First Fed. S. & L. Ass'n,* 273 Md. 610, 614, 331 A.2d 299 (1975) in asserting,

after noting several other requirements of a valid contract: "Finally, the agreement must be supported by sufficient consideration." We abide by that principle in determining the validity of the charitable subscriptions.

V

When the facts concerning the charitable subscription of Polinger are viewed in light of the Maryland law, it is manifest that his promise was not legally enforceable. There was no consideration as required by contract law. The incidents on which *Gittings* indicated a charitable pledge was enforceable, and on which *Erdman* and *Sterling* held the subscriptions in those cases were enforceable are not present here. The consideration recited by the pledge card was "the obligation incurred based upon this pledge. . . ." But there was no legal obligation incurred in the circumstances. Polinger's pledge was not made in consideration of the pledges of others, and there was no evidence that others in fact made pledges in consideration of Polinger's pledge. No release was given or binding agreement made by the UJA on the strength of Polinger's pledge. The pledge was not for a specific enterprise; it was to the UJA generally and to the Israel Emergency Fund. With respect to the former, no allocation by UJA to its beneficiary organization was threatened or thwarted by the failure to collect the Polinger pledge in its entirety, and, with respect to the latter, UJA practice was to pay over to the Fund only what it actually collected, not what was pledged. UJA borrowed no money on the faith and credit of the pledge. The pledge prompted no "action or forbearance of a definite and substantial character" on the part of UJA. No action was taken by UJA on the strength of the pledge that could reasonably be termed "definite and substantial" from which it should be held harmless. There was no change shown in the position of UJA made in reliance on the subscription which resulted in an economic loss, and, in fact, there was no such loss demonstrated. UJA was able to fulfill all of its allocations.[6]

---

6. The Executive Vice-President Emeritus of UJA testified that he could not identify a failure to pay any allocation "because every month every local agency got a check from us. And maybe every three months every national agency got a check from us."

Polinger's pledge was utilized as a means to obtain substantial pledges from others. But this was a technique employed to raise money. It did not supply a legal consideration to Polinger's pledge. On the facts of this case, it does not appear that injustice can be avoided only by enforcement of the promise.

To summarize, there was no specific goal prompting the pledge such as existed in *Gittings, Erdman* and *Sterling* with a mutual awareness of future reliance on the subscription. UJA did not enter into binding contracts, incur expenses or suffer liabilities in reliance on the pledge. UJA's function was to serve as a conduit or clearinghouse to collect gifts of money from many sources and to funnel them into various charitable organizations. It did, of course, plan for the future, in that it estimated the rate of cash flow based on the pledges it received and told its beneficiaries to expect certain amounts. In so doing, however, it expressly did not incur liabilities in reliance on specific pledges. It seems that none of the organizations to which it allocated money would have legal rights against UJA in the event of failure to pay the allocation, and, in any event, UJA, cognizant of the past history of collections, made due allowance for the fact that a certain percentage of the pledges would not be paid.

We hold that Polinger's pledge to UJA was a gratuitous promise. It had no legal consideration, and under the law of this State was unenforceable. The Orphans' Court for Montgomery County erred in allowing the claim for the unpaid balance of the subscription, and its order of 5 January 1979 is vacated with direction to enter an order disallowing the claim filed by UJA.

> *Order of 5 January 1979 of the Orphans' Court for Montgomery County vacated; case remanded to that court with direction to enter an order disallowing the claim filed by the United Jewish Appeal Federation of Greater Washington, Inc.; costs to be paid by appellee.*