674 A.2d 521

**PAVEL ENTERPRISES, INC.**

v.

**A.S. JOHNSON COMPANY, INC.**

No. 62, Sept. Term, 1995.

Court of Appeals of Maryland.

April 10, 1996.

Douglas L. Patin (Spriggs & Hollingsworth, on brief) Washington, DC, for Appellant.

Tarrant H. Lomax (Rhodes, Dunbar & Lomax, Chartered, on brief) Washington, DC, for Appellee.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL, and RAKER, JJ.

KARWACKI, Judge.

In this case we are invited to adapt the "modern" contractual theory of detrimental reliance,[1] or promissory estoppel, to the relationship between general contractors and their subcontractors. Although the theory of detrimental reliance is available to general contractors, it is not applicable to the facts of this case. For that reason, and because there was no traditional bilateral contract formed, we shall affirm the trial court.

## I

The National Institutes of Health [hereinafter, "NIH"], solicited bids for a renovation project on Building 30 of its Bethesda, Maryland campus. The proposed work entailed some demolition work, but the major component of the job

---

1. We prefer to use the phrase detrimental reliance, rather than the traditional nomenclature of "promissory estoppel," because we believe it more clearly expresses the concept intended. Moreover, we hope that this will alleviate the confusion which until now has permitted practitioners to confuse promissory estoppel with its distant cousin, equitable estoppel. *See* Note, *The "Firm Offer" Problem in Construction Bids and the Need for Promissory Estoppel,* 10 WM & MARY L.REV. 212, 214 n. 17 (1968) [hereinafter, *"The Firm Offer Problem "*].

was mechanical, including heating, ventilation and air conditioning ["HVAC"]. Pavel Enterprises Incorporated [hereinafter, "PEI"], a general contractor from Vienna, Virginia and appellant in this action, prepared a bid for the NIH work. In preparing its bid, PEI solicited sub-bids from various mechanical subcontractors. The A.S. Johnson Company [hereinafter, "Johnson"], a mechanical subcontractor located in Clinton, Maryland and the appellee here, responded with a written scope of work proposal on July 27, 1993.[2] On the morning of August 5, 1993, the day NIH opened the general contractors' bids, Johnson verbally submitted a quote of $898,000 for the HVAC component.[3] Neither party disputes that PEI used Johnson's sub-bid in computing its own bid. PEI submitted a bid of $1,585,000 for the entire project.

General contractors' bids were opened on the afternoon of August 5, 1993. PEI's bid was the *second* lowest bid. The government subsequently disqualified the apparent low bidder,[4] however, and in mid-August, NIH notified PEI that its bid would be accepted.

With the knowledge that PEI was the lowest responsive bidder, Thomas F. Pavel, president of PEI, visited the offices of A.S. Johnson on August 26, 1993, and met with James Kick, Johnson's chief estimator, to discuss Johnson's proposed role in the work. Pavel testified at trial to the purpose of the meeting:

---

**2.** The scope of work proposal listed all work that Johnson proposed to perform, but omitted the price term. This is a standard practice in the construction industry. The subcontractor's bid price is then filled in immediately before the general contractor submits the general bid to the letting party.

**3.** PEI alleged at trial that Johnson's bid, as well as the bids of the other potential mechanical subcontractors contained a fixed cost of $355,000 for a sub-sub-contract to "Landis and Gear Powers" [hereinafter, "Powers"]. Powers was the sole source supplier of the electric controls for the project.

**4.** The project at NIH was part of a set-aside program for small business. The apparent low bidder, J.J. Kirlin, Inc. was disqualified because it was not a small business.

"I met with Mr. Kick. And the reason for me going to their office was to look at their offices, to see their facility, to basically sit down and talk with them, as I had not done, and my company had not performed business with them on a direct relationship, but we had heard of their reputation. I wanted to go out and see where their facility was, see where they were located, and basically just sit down and talk to them. Because if we were going to use them on a project, I wanted to know who I was dealing with."

Pavel also asked if Johnson would object to PEI subcontracting directly with Powers for electric controls, rather than the arrangement originally envisioned in which Powers would be Johnson's subcontractor.[5] Johnson did not object.

Following that meeting, PEI sent a fax to all of the mechanical subcontractors from whom it had received sub-bids on the NIH job. The text of that fax is reproduced:

Pavel Enterprises, Inc.

TO: PROSPECTIVE MECHANICAL SUBCONTRACTORS

FROM: ESTIMATING DEPARTMENT

REFERENCE: NIH, BLDG 30 RENOVATION

We herewith respectfully request that you review your bid on the above referenced project that was bid on 8/05/93. PEI has been notified that we will be awarded the project as J.J. Kirlin, Inc. [the original low bidder] has been found to be nonresponsive on the solicitation. We anticipate award on or around the first of September and therefor request that you supply the following information.

1. Please break out your cost for the "POWERS" supplied control work as we will be subcontracting directly to "POWERS".

---

5. Pavel testified at trial that restructuring the arrangement in this manner would reduce the amount PEI needed to bond and thus reduce the price of the bond.

2. Please resubmit your quote deleting the above referenced item.

We ask this in an effort to allow all prospective bidders to compete on an even playing field.

Should you have any questions, please call us immediately as time is of the essence.

On August 30, 1993, PEI informed NIH that Johnson was to be the mechanical subcontractor on the job. On September 1, 1993, PEI mailed and faxed a letter to Johnson formally accepting Johnson's bid. That letter read:

Pavel Enterprises, Inc.

September 1, 1993

Mr. James H. Kick, Estimating Mngr.

A.S. Johnson Company

8042 Old Alexandria Ferry Road

Clinton, Maryland 20735

Re: NIH Bldg 30 HVAC Modifications

RC: IFB # 263–93–B (CM)—0422

Subject: Letter of Intent to award SUBJECT: Subcontract

Dear Mr. Kick;

We herewith respectfully inform your office of our intent to award a subcontract for the above referenced project per your quote received on 8/05/93 in the amount of $898,000.00. This subcontract will be forwarded upon receipt of our contract from the NIH, which we expect any day. A preconstruction meeting is currently scheduled at the NIH on 9/08/93 at 10 AM which we have been requested that your firm attend.

As discussed with you, a meeting was held between NIH and PEI wherein PEI confirmed our bid to the government, and designated your firm as our HVAC Mechanical subcontractor. This action was taken after several telephonic and face to face discussions with you regarding the above referenced bid submitted by your firm.

We look forward to working with your firm on this contract and hope that this will lead to a long and mutually beneficial relationship.

Sincerely,

/s/ Thomas F. Pavel,

President

Upon receipt of PEI's fax of September 1, James Kick called and informed PEI that Johnson's bid contained an error, and as a result the price was too low. According to Kick, Johnson had discovered the mistake earlier, but because Johnson believed that PEI had not been awarded the contract, they did not feel compelled to correct the error. Kick sought to withdraw Johnson's bid, both over the telephone and by a letter dated September 2, 1993:

*A.S. Johnson Co.*

September 2, 1993

PEI Construction

780 West Maples Avenue, Suite 101

Vienna, Virginia 22180

Attention: Thomas Pavel,

ATTENTION: President

Reference: NIH Building 30 HVAC Modifications

Dear Mr. Pavel,

We respectfully inform you of our intention to withdraw our proposal for the above referenced project due to an error in our bid.

As discussed in our telephone conversation and face to face meeting, the management of A.S. Johnson Company was reviewing this proposal, upon which we were to confirm our pricing to you.

Please contact Mr. Harry Kick, General Manager at [telephone number deleted] for any questions you may have.

Very truly yours,

/s/ James H. Kick

Estimating Manager

PEI responded to both the September 1 phone call, and the September 2 letter, expressing its refusal to permit Johnson to withdraw.

On September 28, 1993, NIH formally awarded the construction contract to PEI. PEI found a substitute subcontractor to do the mechanical work, but at a cost of $930,000.[6] PEI brought suit against Johnson in the Circuit Court for Prince George's County to recover the $32,000 difference between Johnson's bid and the cost of the substitute mechanical subcontractor.

The case was heard by the trial court without the aid of a jury. The trial court made several findings of fact, which we summarize:

1. PEI relied upon Johnson's sub-bid in making its bid for the entire project;
2. The fact that PEI was not the low bidder, but was awarded the project only after the apparent low bidder was disqualified, takes this case out of the ordinary;
3. Prior to NIH awarding PEI the contract on September 28, Johnson, on September 2, withdrew its bid; and
4. PEI's letter to all potential mechanical subcontractors, dated August 26, 1993, indicates that there was no definite agreement between PEI and Johnson, *and* that PEI was not relying upon Johnson's bid.

The trial court analyzed the case under both a traditional contract theory and under a detrimental reliance theory. PEI was unable to satisfy the trial judge that under either theory that a contractual relationship had been formed.

PEI appealed to the Court of Special Appeals, raising both traditional offer and acceptance theory, and "promissory estoppel." Before our intermediate appellate court considered the case, we issued a writ of certiorari on our own motion.

---

**6.** The record indicates that the substitute mechanical subcontractor used "Powers" as a sub-subcontractor and did not "break out" the "Powers" component to be directly subcontracted by PEI.

## II

The relationships involved in construction contracts have long posed a unique problem in the law of contracts. A brief overview of the mechanics of the construction bid process, as well as our legal system's attempts to regulate the process, is in order.

### A. CONSTRUCTION BIDDING.

Our description of the bid process in *Maryland Supreme Corp. v. Blake Co.*, 279 Md. 531, 369 A.2d 1017 (1977) is still accurate:

> "In such a building project there are basically three parties involved: the letting party, who calls for bids on its job; the general contractor, who makes a bid on the whole project; and the subcontractors, who bid only on that portion of the whole job which involves the field of its specialty. The usual procedure is that when a project is announced, a subcontractor, on his own initiative or at the general contractor's request, prepares an estimate and submits a bid to one or more of the general contractors interested in the project. The general contractor evaluates the bids made by the subcontractors in each field and uses them to compute its total bid to the letting party. After receiving bids from general contractors, the letting party ordinarily awards the contract to the lowest reputable bidder."

*Id.* at 533–34, 369 A.2d at 1020–21 (citing *The Firm Offer Problem* )

### B. THE CONSTRUCTION BIDDING CASES—AN HISTORICAL OVERVIEW.

The problem the construction bidding process poses is the determination of the precise points on the timeline that the various parties become bound to each other. The early landmark case was *James Baird Co. v. Gimbel Bros., Inc.*, 64 F.2d 344 (2d Cir.1933). The plaintiff, James Baird Co., ["Baird"] was a general contractor from Washington, D.C., bidding to construct a government building in Harrisburg, Pennsylvania.

Gimbel Bros., Inc., ["Gimbel"], the famous New York department store, sent its bid to supply linoleum to a number of bidding general contractors on December 24, and Baird received Gimbel's bid on December 28. Gimbel realized its bid was based on an incorrect computation and notified Baird of its withdrawal on December 28. The letting authority awarded Baird the job on December 30. Baird formally accepted the Gimbel bid on January 2. When Gimbel refused to perform, Baird sued for the additional cost of a substitute linoleum supplier. The Second Circuit Court of Appeals held that Gimbel's initial bid was an offer to contract and, under traditional contract law, remained open only until accepted or withdrawn. Because the offer was withdrawn before it was accepted there was no contract. Judge Learned Hand, speaking for the court, also rejected two alternative theories of the case: unilateral contract and promissory estoppel. He held that Gimbel's bid was not an offer of a unilateral contract[7] that Baird could accept by performing, *i.e.*, submitting the bid as part of the general bid; and second, he held that the theory of promissory estoppel was limited to cases involving charitable pledges.

Judge Hand's opinion was widely criticized, *see* Note, *Contracts–Promissory Estoppel*, 20 VA.L.REV. 214 (1933) [hereinafter, "*Promissory Estoppel*"]; Note, *Contracts–Revocation of Offer Before Acceptance–Promissory Estoppel*, 28 ILL.L.REV. 419 (1934), but also widely influential. The effect of the *James Baird* line of cases, however, is an "obvious injustice without relief of any description." *Promissory Estoppel*, at 215. The general contractor is bound to the price submitted to the letting party, but the subcontractors are not bound, and are free to withdraw.[8] As one commentator described it, "If

---

**7.** A unilateral contract is a contract which is accepted, not by traditional acceptance, but by performance. 2 *Williston on Contracts* § 6:2 (4th ed.).

**8.** Note that under the *Baird* line of cases, the general contractor, while bound by his offer to the letting party, is not bound to any specific subcontractor, and is free to "bid shop" prior to awarding the subcon-

the subcontractor revokes his bid before it is accepted by the general, any loss which results is a deduction from the general's profit and conceivably may transform overnight a profitable contract into a losing deal." Franklin M. Schultz, *The Firm Offer Puzzle: A Study of Business Practice in the Construction Industry,* 19 U.CHI.L.REV. 237, 239 (1952).

The unfairness of this regime to the general contractor was addressed in *Drennan v. Star Paving,* 333 P.2d 757, 51 Cal.2d 409 (1958). Like *James Baird,* the *Drennan* case arose in the context of a bid mistake.[9] Justice Traynor, writing for the Supreme Court of California, relied upon § 90 of the *Restatement (First) of Contracts:*

> "A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."

---

tract. Michael L. Closen & Donald G. Weiland, *The Construction Industry Bidding Cases: Application of Traditional Contract, Promissory Estoppel, and Other Theories to the Relations Between General Contractors and Subcontractors,* 13 J. MARSHALL L.REV 565, 583 (1980). At least one commentator argues that although potentially unfair, this system creates a necessary symmetry between general and subcontractors, in that neither party is bound. Note, *Construction Contracts—The Problem of Offer and Acceptance in the General Contractor–Subcontractor Relationship,* 37 U.CINN.L.REV. 798 (1980) [hereinafter, *"The Problem of Offer and Acceptance "*].

9. Commentators have suggested that the very fact that many of these cases have arisen from bid mistake, an unusual subspecies, rather than from more typical cases, has distorted the legal system's understanding of these cases. Comment, *Bid Shopping and Peddling in the Subcontract Construction Industry,* 18 UCLA L.REV. 389, 409 (1970) [hereinafter, *"Bid Shopping "*]. *See also* note, *Once Around the Flag Pole: Construction Bidding and Contracts at Formation,* 39 N.Y.U.L.REV. 816, 818 (1964) [hereinafter, *"Flag Pole "*] (bid mistake cases generally portray general contractor as victim, but market reality is that subs are usually in weaker negotiating position).

*Restatement (First) of Contracts* § 90 (1932).[10]

Justice Traynor reasoned that the subcontractor's bid contained an implied subsidiary promise not to revoke the bid. As the court stated:

> "When plaintiff [, a General Contractor,] used defendant's offer in computing his own bid, he bound himself to perform in reliance on defendant's terms. Though defendant did not bargain for the use of its bid neither did defendant make it idly, indifferent to whether it would be used or not. On the contrary it is reasonable to suppose that defendant submitted its bid to obtain the subcontract. It was bound to realize the substantial possibility that its bid would be the lowest, and that it would be included by plaintiff in his bid. It was to its own interest that the contractor be awarded the general contract; the lower the subcontract bid, the lower the general contractor's bid was likely to be and the greater its chance of acceptance and hence the greater defendant's chance of getting the paving subcontract. Defendant had reason not only to expect plaintiff to rely on its bid but to want him to. Clearly defendant had a stake in plaintiff's reliance on its bid. Given this interest and the fact that plaintiff is bound by his own bid, it is only fair that plaintiff should have at least an opportunity to accept defendant's bid after the general contract has been awarded to him."

*Drennan*, 51 Cal.2d at 415, 333 P.2d at 760. The *Drennan* court however did not use "promissory estoppel" as a substitute for the entire contract, as is the doctrine's usual function. Instead, the *Drennan* court, applying the principle of § 90, interpreted the subcontractor's bid to be irrevocable. Justice Traynor's analysis used promissory estoppel as consideration for an implied promise to keep the bid open for a reasonable time. Recovery was then predicated on traditional bilateral contract, with the sub-bid as the offer and promissory estoppel serving to replace acceptance.

---

**10.** This section of the Restatement has been supplanted by the *Restatement (Second) of Contracts* § 90(1) (1979). That provision will be discussed, infra.

The *Drennan* decision has been very influential. Many states have adopted the reasoning used by Justice Traynor. *See, e.g., Debron Corp. v. National Homes Constr. Corp.,* 493 F.2d 352 (8th Cir.1974) (applying Missouri law); *Reynolds v. Texarkana Constr. Co.,* 237 Ark. 583, 374 S.W.2d 818 (1964); *Mead Assocs. Inc. v. Antonsen,* 677 P.2d 434 (Colo.1984); *Illinois Valley Asphalt v. J.F. Edwards Constr. Co.,* 45 Ill. Dec. 876, 413 N.E.2d 209, 90 Ill.App.3d 768 (Ill.Ct.App.1980); *Lichtefeld–Massaro, Inc. v. R.J. Manteuffel Co.,* 806 S.W.2d 42 (Ky.App.1991); *Constructors Supply Co. v. Bostrom Sheet Metal Works, Inc.,* 291 Minn. 113, 190 N.W.2d 71 (1971); *E.A. Coronis Assocs. v. M. Gordon Constr. Co.,* 90 N.J. Super 69, 216 A.2d 246 (1966).

Despite the popularity of the *Drennan* reasoning, the case has subsequently come under some criticism.[11] The criticism centers on the lack of symmetry of detrimental reliance in the bid process, in that subcontractors are bound to the general, but the general is not bound to the subcontractors.[12] The result is that the general is free to bid shop,[13] bid chop[14], and to encourage bid peddling,[15] to the detriment of

---

**11.** *Home Elec. Co. v. Underdown Heating & Air Conditioning Co.,* 86 N.C.App. 540, 358 S.E.2d 539 (1987). *See also, The Problem of Offer and Acceptance.*

**12.** *See Williams v. Favret,* 161 F.2d 822, 823 n. 1 (5th Cir.1947); *Merritt–Chapman & Scott Corp. v. Gunderson Bros. Eng'g Corp.,* 305 F.2d 659 (9th Cir.1962). *But see Electrical Constr. & Maintenance Co. v. Maeda Pac. Corp.,* 764 F.2d 619 (9th Cir.1985) (subcontractor rejected by general contractor could maintain an action in both traditional contract or promissory estoppel). *See Bid Shopping,* at 405–09 (suggesting using "promissory estoppel" to bind generals to subcontractors, as well as subs to generals, in appropriate circumstances).

**13.** Bid shopping is the use of the lowest subcontractor's bid as a tool in negotiating lower bids from other subcontractors post-award.

**14.** "The general contractor, having been awarded the prime contract, may pressure the subcontractor whose bid was used for a particular portion of the work in computing the overall bid on the prime contract to reduce the amount of the bid." Closen & Weiland, at 566 n. 6.

**15.** An unscrupulous subcontractor can save estimating costs, and still get the job by not entering a bid or by entering an uncompetitive bid.

the subcontractors. One commentator described the problems that these practices create:

"Bid shopping and peddling have long been recognized as unethical by construction trade organizations. These 'unethical,' but common practices have several detrimental results. First, as bid shopping becomes common within a particular trade, the subcontractors will pad their initial bids in order to make further reductions during post-award negotiations. This artificial inflation of subcontractor's offers makes the bid process less effective. Second, subcontractors who are forced into post-award negotiations with the general often must reduce their sub-bids in order to avoid losing the award. Thus, they will be faced with a Hobson's choice between doing the job at a loss or doing a less than adequate job. Third, bid shopping and peddling tend to increase the risk of loss of the time and money used in preparing a bid. This occurs because generals and subcontractors who engage in these practices use, without expense, the bid estimates prepared by others. Fourth, it is often impossible for a general to obtain bids far enough in advance to have sufficient time to properly prepare his own bid because of the practice, common among many subcontractors, of holding sub-bids until the last possible moment in order to avoid pre-award bid shopping by the general. Fifth, many subcontractors refuse to submit bids for jobs on which they expect bid shopping. As a result, competition is reduced, and, consequently, construction prices are increased. Sixth, any price reductions gained through the use of post-award bid shopping by the general will be of no benefit to the awarding authority, to whom these price reductions would normally accrue as a result of open compe-

---

After bid opening, this unscrupulous subcontractor, knowing the price of the low sub-bid, can then offer to perform the work for less money, precisely because the honest subcontractor has already paid for the estimate and included that cost in the original bid. This practice is called bid peddling.

tition before the award of the prime contract. Free competition in an open market is therefore perverted because of the use of post-award bid shopping."

*Bid Shopping,* at 394–96 (citations omitted). *See also Flag Pole,* at 818 (bid mistake cases generally portray general contractor as victim, but market reality is that subs are usually in weaker negotiating position); Jay M. Feinman, *Promissory Estoppel and Judicial Method,* 97 HARV.L.REV. 678, 707–08 (1984). These problems have caused at least one court to reject promissory estoppel in the contractor-subcontractor relationship. *Home Elec. Co. v. Underdown Heating & Air Conditioning Co.,* 86 N.C.App. 540, 358 S.E.2d 539 (1987). *See also* Note, *Construction Contracts—The Problem of Offer and Acceptance in the General Contractor–Subcontractor Relationship,* 37 U.CINN.L.RE. 798 (1980). But other courts, while aware of the limitations of promissory estoppel, have adopted it nonetheless. *See, e.g., Alaska Bussell Elec. Co. v. Vern Hickel Constr. Co.,* 688 P.2d 576 (Alaska 1984).[16]

The doctrine of detrimental reliance has evolved in the time since *Drennan* was decided in 1958. The American Law Institute, responding to *Drennan,* sought to make detrimental reliance more readily applicable to the construction bidding scenario by adding § 87. This new section was intended to make subcontractors' bids binding:

"§ 87. OPTION CONTRACT

. . . . .

(2) An offer which the offeror should reasonably expect to induce action or forbearance of a substantial character on the part of the offeree before acceptance and which does

---

**16.** The critical literature also contains numerous suggestions that might be undertaken by the legislature to address the problems of bid shopping, chopping, and peddling. *See* Note, *Construction Bidding Problem: Is There a Solution Fair to Both the General Contractor and Subcontractor?,* 19 ST. LOUIS L.REV. 552, 568–72 (1975) (discussing bid depository and bid listing schemes); *Flag Pole,* at 825–26.

induce such action or forbearance is binding as an option contract to the extent necessary to avoid injustice."

*Restatement (Second) of Contracts* § 87 (1979).[17]

Despite the drafter's intention that § 87 of the *Restatement (Second) of Contracts* (1979) should replace *Restatement (First) of Contracts* § 90 (1932) in the construction bidding cases, few courts have availed themselves of the opportunity. *But see, Arango Constr. Co. v. Success Roofing, Inc.,* 46 Wash.App. 314, 321–22, 730 P.2d 720, 725 (1986). Section 90(1) of the *Restatement (Second) of Contracts* (1979) modified the first restatement formulation in three ways, by: 1) deleting the requirement that the action of the offeree be "definite and substantial;" 2) adding a cause of action for third party reliance; and 3) limiting remedies to those required by justice.[18]

Courts and commentators have also suggested other solutions intended to bind the parties without the use of detrimental reliance theory. The most prevalent suggestion[19] is the use of the firm offer provision of the Uniform Commercial

---

**17.** This provision was derived from *Restatement (Second) of Contracts* § 89B(2) (Tent.Drafts Nos. 1–7, 1973). There are cases that refer to the tentative drafts. *See Loranger Constr. Corp. v. E.F. Hauserman Co.,* 384 N.E.2d 176, 179, 376 Mass. 757, 763 (1978). *See also* Closen & Weiland, at 593–97.

**18.** Section 90 of the *Restatement (First) of Contracts* (1932) explains detrimental reliance as follows:

"A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."

Section 90(1) of the *Restatement (Second) Contracts* (1979) defines the doctrine of detrimental reliance as follows:

"A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires."

**19.** *See Bid Shopping and Peddling* at 399–401; *Firm Offer Problem* at 215; Closen & Weiland, at 604 n. 133.

Code. Maryland Code (1992 Repl.Vol.), § 2–205 of the Commercial Law Article. That statute provides:

> "An offer by a merchant to buy or sell goods in a signed writing which by its terms gives assurance that it will be held open is not revocable, for lack of consideration, during the time stated or if no time is stated for a reasonable time, but in no event may such period of irrevocability exceed three months; but any such term of assurance on a form supplied by the offeree must be separately signed by the offeror."

In this manner, subcontractor's bids, made in writing and giving some assurance of an intent that the offer be held open, can be found to be irrevocable.

The Supreme Judicial Court of Massachusetts has suggested three other traditional theories that might prove the existence of a contractual relationship between a general contractor and a sub: conditional bilateral contract analysis; unilateral contract analysis; and unrevoked offer analysis. *Loranger Constr. Corp. v. E.F. Hauserman Co.*, 384 N.E.2d 176, 376 Mass. 757 (1978). If the general contractor could prove that there was an exchange of promises binding the parties to each other, and that exchange of promises was made before bid opening, that would constitute a valid bilateral promise conditional upon the general being awarded the job. *Loranger*, 384 N.E.2d at 180, 376 Mass. at 762. This directly contrasts with Judge Hand's analysis in *James Baird*, that a general's use of a sub-bid constitutes acceptance conditional upon the award of the contract to the general. *James Baird*, 64 F.2d at 345–46.

Alternatively, if the subcontractor intended its sub-bid as an offer to a unilateral contract, use of the sub-bid in the general's bid constitutes part performance, which renders the initial offer irrevocable under the *Restatement (Second) of Contracts* § 45 (1979). *Loranger*, 384 N.E.2d at 180, 376 Mass. at 762. This resurrects a second theory dismissed by Judge Learned Hand in *James Baird*.

Finally, the *Loranger* court pointed out that a jury might choose to disbelieve that a subcontractor had withdrawn the winning bid, meaning that acceptance came before withdrawal, and a traditional bilateral contract was formed. *Loranger*, 384 N.E.2d at 180, 376 Mass. at 762–63.[20]

Another alternative solution to the construction bidding problem is no longer seriously considered-revitalizing the common law seal. William Noel Keyes, *Consideration Reconsidered—The Problem of the Withdrawn Bid*, 10 STAN.L.REV. 441, 470 (1958). Because a sealed option contract remains firm without consideration this alternative was proposed as a solution to the construction bidding problem.[21]

It is here that the state of the law rests.

## III

If PEI is able to prove by any of the theories described that a contractual relationship existed, but Johnson failed to perform its end of the bargain, then PEI will recover the $32,000 in damages caused by Johnson's breach of contract. Alternatively, if PEI is unable to prove the existence of a contractual relationship, then Johnson has no obligation to PEI. We will test the facts of the case against the theories described to determine if such a relationship existed.

The trial court held, and we agree, that Johnson's sub-bid was an offer to contract and that it was sufficiently clear and definite. We must then determine if PEI made a timely and valid acceptance of that offer and thus created a traditional bilateral contract, or in the absence of a valid acceptance, if PEI's detrimental reliance served to bind Johnson to its sub-

---

**20.** For an excellent analysis of the *Loranger* case, *see* Closen & Weiland at 597–603.

**21.** Of course, general contractors could require their subcontractors to provide their bids under seal. The fact that they do not is testament to the lack of appeal this proposal holds.

bid. We examine each of these alternatives, beginning with traditional contract theory.[22]

## A. TRADITIONAL BILATERAL CONTRACT

The trial judge found that there was not a traditional contract binding Johnson to PEI. A review of the record and the trial judge's findings make it clear that this was a close question. On appeal however, our job is to assure that the trial judge's findings were not clearly erroneous. Maryland Rule 8–131(c). This is an easier task.

The trial judge rejected PEI's claim of bilateral contract for two separate reasons: 1) that there was no meeting of the minds; and 2) that the offer was withdrawn prior to acceptance. Both need not be proper bases for decision; if either of these two theories is not clearly erroneous, we must affirm.

There is substantial evidence in the record to support the judge's conclusion that there was no meeting of the minds. PEI's letter of August 26, to all potential mechanical subcontractors, reproduced *supra*, indicates, as the trial judge found, that PEI and Johnson "did not have a definite, certain meeting of the minds on a certain price for a certain quantity of

---

**22.** Because they were not raised, either below or in this Court, we need not address the several methods in which a court might interpret a subcontractor's bid as a firm, and thus irrevocable, offer. Nevertheless, for the benefit of bench and bar, we review those theories as applied to this case. First, PEI could have purchased an option, thus supplying consideration for making the offer irrevocable. This did not happen. Second, Johnson could have submitted its bid as a sealed offer. Md. Code (1995 Repl.Vol.), § 5–102 of the Courts & Judicial Proceedings Article. An offer under seal supplants the need for consideration to make an offer firm. This did not occur in the instant case. The third method of Johnson's offer becoming irrevocable is by operation of Md.Code (1992 Repl.Vol.), § 2–205 of the Commercial Law Article. We note that Johnson's sub-bid was made in the form of a signed writing, but without further evidence we are unable to determine if the offer "by its terms gives assurance that it will be held open" and if the sub-bid is for "goods" as that term is defined by Md.Code (1994 Repl.Vol.), § 2–105(1) of the Commercial Law Article and by decisions of this Court, including *Anthony Pools v. Sheehan*, 295 Md. 285, 455 A.2d 434 (1983) and *Burton v. Artery Co.*, 279 Md. 94, 367 A.2d 935 (1977).

goods.... " Because this reason is itself sufficient to sustain the trial judge's finding that no contract was formed, we affirm.

■ Alternatively, we hold, that the evidence permitted the trial judge to find that Johnson revoked its offer prior to PEI's final acceptance. We review the relevant chronology. Johnson made its offer, in the form of a sub-bid, on August 5. On September 1, PEI accepted. Johnson withdrew its offer by letter dated September 2. On September 28, NIH awarded the contract to PEI. Thus, PEI's apparent acceptance came one day *prior* to Johnson's withdrawal.

The trial court found, however, "that before there was ever a final agreement reached with the contract awarding authorities, that Johnson made it clear to [PEI] that they were not going to continue to rely on their earlier submitted bid." Implicit in this finding is the judge's understanding of the contract. Johnson's sub-bid constituted an offer of a contingent contract. PEI accepted that offer subject to the condition precedent of PEI's receipt of the award of the contract from NIH. Prior to the occurrence of the condition precedent, Johnson was free to withdraw. *See* 2 *Williston on Contracts* § 6:14 (4th ed.). On September 2, Johnson exercised that right to revoke.[23] The trial judge's finding that withdrawal proceeded valid final acceptance is therefore logical and supported by substantial evidence in the record. It was not clearly erroneous, so we shall affirm.

---

**23.** We have also considered the possibility that Johnson's offer was not to enter into a contingent contract. This is unlikely because there is no incentive for a general contractor to accept a non-contingent contract prior to contract award but it would bind the general to purchase the subcontractor's services even if the general did not receive the award. Moreover, PEI's September 1 letter clearly "accepted" Johnson's offer subject to the award from NIH. If Johnson's bid was for a non-contingent contract, PEI's response substantially varied the offer and was therefore a counter-offer, not an acceptance. *Post v. Gillespie*, 219 Md. 378, 385–86, 149 A.2d 391, 395–96 (1959); 2 *Williston on Contracts* § 6:13 (4th ed.).

## B. DETRIMENTAL RELIANCE

PEI's alternative theory of the case is that PEI's detrimental reliance binds Johnson to its bid. We are asked, as a threshold question, if detrimental reliance applies to the setting of construction bidding. Nothing in our previous cases suggests that the doctrine was intended to be limited to a specific factual setting. The benefits of binding subcontractors outweigh the possible detriments of the doctrine.[24]

This Court has decided cases based on detrimental reliance as early as 1854,[25] and the general contours of the doctrine are well understood by Maryland courts. The historical development of promissory estoppel, or detrimental reliance, in Maryland has mirrored the development nationwide. It was originally a small exception to the general consideration requirement, and found in "cases dealing with such narrow problems as gratuitous agencies and bailments, waivers, and promises of marriage settlement." Jay M. Feinman, *Promissory Estoppel and Judicial Method*, 97 HARV.L.REV. 678, 680 (1984). The early Maryland cases applying "promissory estoppel" or detrimental reliance primarily involve charitable pledges.

The leading case is *Maryland Nat'l Bank v. United Jewish Appeal Fed'n of Greater Washington*, 286 Md. 274, 407 A.2d 1130 (1979), where this Court's opinion was authored by the late Judge Charles E. Orth, Jr. In that case, a decedent, Milton Polinger, had pledged $200,000 to the United Jewish Appeal ["UJA"]. The UJA sued Polinger's estate in an attempt to collect the money promised them. Judge Orth reviewed four prior decisions of this Court[26] and determined

---

**24.** General contractors, however, should not assume that we will also adopt the holdings of our sister courts who have refused to find general contractors bound to their subcontractors. *See, e.g., N. Litterio & Co. v. Glassman Constr. Co.*, 319 F.2d 736 (D.C.Cir.1963).

**25.** *Gittings v. Mayhew*, 6 Md. 113 (1854).

**26.** The cases reviewed were *Gittings v. Mayhew*, 6 Md. 113 (1854); *Erdman v. Trustees Eutaw M.P. Ch.*, 129 Md. 595, 99 A. 793 (1917);

that *Restatement (First) of Contracts* § 90 (1932) applied. *Id.* at 281, 407 A.2d at 1134. Because the Court found that the UJA had not acted in a "definite or substantial" manner in reliance on the contribution, no contract was found to have been created. *Id.* at 289–90, 407 A.2d at 1138–39.

Detrimental reliance doctrine has had a slow evolution from its origins in disputes over charitable pledges, and there remains some uncertainty about its exact dimensions.[27] Two cases from the Court of Special Appeals demonstrate that confusion.

The first, *Snyder v. Snyder*, 79 Md.App. 448, 558 A.2d 412 (1989), arose in the context of a suit to enforce an antenuptial agreement. To avoid the statute of frauds, refuge was sought in the doctrine of "promissory estoppel."[28] The court held

---

*Sterling v. Cushwa & Sons*, 170 Md. 226, 183 A. 593 (1936); and *American University v. Collings*, 190 Md. 688, 59 A.2d 333 (1948).

**27.** Other cases merely acknowledged the existence of a doctrine of "promissory estoppel," but did not comment on the standards for the application of this doctrine. *See, e.g., Chesapeake Supply & Equip. Co. v. Manitowoc Eng'g Corp.*, 232 Md. 555, 566, 194 A.2d 624, 630 (1963).

**28.** Section 139 of the *Restatement (Second) of Contracts* (1979) provides that detrimental reliance can remove a case from the statute of frauds:

"**Enforcement by Virtue of Action in Reliance**

(1) A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce the action or forbearance is enforceable notwithstanding the Statute of Frauds if injustice can be avoided only by enforcement of the promise. The remedy granted for breach is to be limited as justice requires.

(2) In determining whether injustice can be avoided only by enforcement of the promise, the following circumstances are significant:

(a) the availability and adequacy of other remedies, particularly cancellation and restitution;

(b) the definite and substantial character of the action or forbearance in relation to the remedy sought;

(c) the extent to which the action or forbearance corroborates evidence of the making and terms of the promise, or the making and terms are otherwise established by clear and convincing evidence;

(d) the reasonableness of the action or forbearance;

(e) the extent to which the action or forbearance was foreseeable by the promisor."

that "promissory estoppel" requires a finding of *fraudulent* conduct on the part of the promisor. *See also Friedman & Fuller v. Funkhouser,* 107 Md.App. 91, 666 A.2d 1298 (1995).

The second, *Kiley v. First Nat'l Bank,* 102 Md.App. 317, 649 A.2d 1145 (1994), the court stated that "[i]t is unclear whether Maryland continues to adhere to the more stringent formulation of promissory estoppel, as set forth in the original *Restatement of Contracts,* or now follows the more flexible view found in the *Restatement (Second) Contracts.*" *Id.* at 336, 649 A.2d at 1154.

■ To resolve these confusions we now clarify that Maryland courts are to apply the test of the *Restatement (Second) of Contracts* § 90(1) (1979), which we have recast as a four-part test:

1. a clear and definite promise;
2. where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee;
3. which does induce actual and reasonable action or forbearance by the promisee; and
4. causes a detriment which can only be avoided by the enforcement of the promise.[29]

---

**29.** This comports with the formulation given by the United States District Court for the District of Maryland in *Union Trust Co. of Md. v. Charter Medical Corp.,* 663 F.Supp. 175, 178 n. 4 (D.Md.1986) *aff'd w/o opinion,* 823 F.2d 548 (4th Cir.1987).

We have adopted language of the *Restatement (Second) of Contracts* (1979) because we believe each of the three changes made to the previous formulation were for the better. As discussed earlier, the first change was to delete the requirement that the action of the offeree be "definite and substantial." Although the Court of Special Appeals in *Kiley v. First Nat'l Bank,* 102 Md.App. 317, 336, 649 A.2d 1145, 1154 (1994) apparently presumed this to be a major change from the "stringent" first restatement to the "more flexible" second restatement, we perceive the language to have always been redundant. If the reliance is not "substantial and definite" justice will not compel enforcement.

The decisions in *Snyder v. Snyder,* 79 Md.App. 448, 558 A.2d 412 (1989) and *Friedman & Fuller v. Funkhouser,* 107 Md.App. 91, 666 A.2d 1298 (1995) to the extent that they required a showing of fraud on the part of the offeree are therefore disapproved.

In a construction bidding case, where the general contractor seeks to bind the subcontractor to the sub-bid offered, the general must first prove that the subcontractor's sub-bid constituted an offer to perform a job at a given price. We do not express a judgment about how precise a bid must be to constitute an offer, or to what degree a general contractor may request to change the offered scope before an acceptance becomes a counter-offer. That fact-specific judgment is best reached on a case-by-case basis. In the instant case, the trial judge found that the sub-bid was sufficiently clear and definite to constitute an offer, and his finding was not clearly erroneous.

Second, the general must prove that the subcontractor reasonably expected that the general contractor would rely upon the offer. The subcontractor's expectation that the general contractor will rely upon the sub-bid may dissipate through time.[30]

In this case, the trial court correctly inquired into Johnson's belief that the bid remained open, and that consequently PEI was not relying on the Johnson bid. The judge found that due to the time lapse between bid opening and award, "it would be unreasonable for offers to continue." This is supported by the substantial evidence. James Kick testified that although he knew of his bid mistake, he did not bother to notify PEI because J.J. Kirlin, Inc., and not PEI, was the apparent low bidder. The trial court's finding that Johnson's reasonable expectation had dissipated in the span of a month is not clearly erroneous.

As to the third element, a general contractor must prove that he actually and reasonably relied on the subcontractor's sub-bid. We decline to provide a checklist of potential methods of proving this reliance, but we will make several

---

30. We expect that evidence of "course of dealing" and "usage of the trade," *see Restatement (Second) of Contracts* §§ 219–223 (1979), will provide strong indicies of the reasonableness of a subcontractor's expectations.

observations. First, a showing by the subcontractor, that the general contractor engaged in "bid shopping," or actively encouraged "bid chopping," or "bid peddling" is strong evidence that the general did *not* rely on the sub-bid. Second, prompt notice by the general contractor to the subcontractor that the general intends to use the sub on the job, is weighty evidence that the general *did* rely on the bid.[31] Third, if a sub-bid is so low that a reasonably prudent general contractor would not rely upon it, the trier of fact may infer that the general contractor did not in fact rely upon the erroneous bid.

In this case, the trial judge did not make a specific finding that PEI failed to prove its reasonable reliance upon Johnson's sub-bid. We must assume, however, that it was his conclusion based on his statement that "the parties did not have a definite, certain meeting of the minds on a certain price for a certain quantity of goods and wanted to renegotiate...." The August 26, 1993, fax from PEI to all prospective mechanical subcontractors, is evidence supporting this conclusion. Although the finding that PEI did not rely on Johnson's bid was indisputably a close call, it was not clearly erroneous.

■ Finally, as to the fourth prima facie element, the trial court, and not a jury, must determine that binding the subcontractor is necessary to prevent injustice. This element is to be enforced as required by common law equity courts—the general contractor must have "clean hands." This requirement includes, as did the previous element, that the general did not engage in bid shopping, chopping or peddling, but also requires the further determination that justice compels the result. The fourth factor was not specifically mentioned by the trial judge, but we may infer that he did not find this case to merit an equitable remedy.

■ Because there was sufficient evidence in the record to support the trial judge's conclusion that PEI had not proven

---

**31.** Prompt notice and acceptance also significantly dispels the possibility of bid shopping, bid chopping, and bid peddling.

its case for detrimental reliance, we must, and hereby do, affirm the trial court's ruling.

## IV

In conclusion, we emphasize that there are different ways to prove that a contractual relationship exists between a general contractor and its subcontractors. Traditional bilateral contract theory is one. Detrimental reliance can be another. However, under the evidence in this case, the trial judge was not clearly erroneous in deciding that recovery by the general contractor was not justified under either theory.

*JUDGMENT AFFIRMED, WITH COSTS.*