860 A.2d 425

CITIROOF, CORP.

v.

TECH CONTRACTING COMPANY, INC.

No. 2211, Sept. Term, 2003.

Court of Special Appeals of Maryland.

Oct. 29, 2004.

580

Alexander J. Crow (John Noble, Noble and Crow, P.A., on the brief), Rockville, for Appellant.

Louis J. Kozlakowski, Jr., (Wright, Constable & Skeen, L.L.P., on the brief), Baltimore, for Appellee.

Panel: HOLLANDER, EYLER, JAMES R., SHARER, JJ.

SHARER, J.

In this dispute between a general contractor and a potential subcontractor, judgment was entered in favor of the former, appellee Tech Contracting Company, Inc., ("Tech") against the latter, Citiroof Corporation, ("Citiroof") appellant. The judgment, entered following a bench trial in the Circuit Court for Baltimore City, has prompted this appeal, in which Citiroof presents for our review one question which, as slightly recast, is:

> Was the circuit court clearly erroneous in finding that Tech had proven the elements of detrimental reliance?

We find no error, and shall affirm.

### Factual History

In March 2000, Tech, a general contractor, in response to a request for bids, submitted a bid to Baltimore County for construction of the Winfield Police Athletic League Center project ("the project"). As part of the process of calculating prices and assembling its bid, Tech solicited proposals from potential subcontractors. In that context, Tech received bids for the roofing portion of the project, including a bid from appellant Citiroof, a contracting company that performs both general contracting and subcontracting services.

At the time, Paul Welch was Citiroof's project estimator. Welch received plans and partial specifications for two similar Baltimore County construction projects, one of which was the project. That information was supplied not by Tech, but by another general contractor who was also a potential bidder. Welch did not have plans and specifications for the entire project, only the specifications for the roofing and a roof plan without dimensions. Based upon the information available to him, Welch, on March 16, 2000, faxed unsolicited bids to a number of general contractors, including Tech. Citiroof's price for the work was $32,200, which, as we shall discuss, was in error. Because the original bid day was postponed by Baltimore County, Tech did not immediately look closely at Citiroof's bid until the rescheduled bid day, March 21, 2000.

On March 21, 2000, Tech received a second bid of $62,803 for the roofing subcontract work from Jottan, Inc. Richard Chapolini,[1] Tech's president, testified that he realized, given the difference between the two prices, that "somebody has got to be right, and somebody has got to be wrong [sic]." While Chapolini recognized that one of the bids was "grossly" wrong, he did not know then whether it was Citiroof's or Jottan's.

Chapolini telephoned Welch and informed him that Citiroof's price was "rather low." The only factor affecting the price that was discussed between Chapolini and Welch during that call was the wage scale. Square footage was not discussed. Until that time, Welch was unaware that the project was subject to a Davis–Bacon wage scale.[2] When informed of this fact, Welch recalculated the price to include the higher

---

1. Throughout the transcript, record extract, and briefs, the spelling is "Chapellini." However, correspondence on Tech's letterhead in the record extract reflect the spelling of "Chapolini." We assume the latter to be correct.

2. The Davis–Bacon Act was enacted to protect employees of government contractors from substandard earnings and to preserve local wage standards. The dual purposes of the Davis–Bacon Act are to give local laborers and contractors a fair opportunity to participate in building programs when federal funds are involved, and to protect local wage standards by preventing contractors from basing their bids on wages

wage rates. He then faxed Citiroof's amended bid to Tech on March 21, 2000, increasing the price by $6,700.

Chapolini then asked Welch if he "had everything included in the bid . . . and [if he] was comfortable with it . . . [because] if his price held up," Tech planned to use it in its bid to the owner. By "held up," Chapolini confirmed that he meant, if Citiroof was the lowest bidder, Tech would incorporate Citiroof's price into its bid. Welch testified that during this same conversation, he asked Chapolini how Citiroof's revised bid stood in comparison to the other roof subcontract bids. Chapolini responded that Citiroof's revised bid was "more in line." When Tech's bid was submitted to the owner, it included the price quoted by Citiroof for the roofing phase of the project. Chapolini testified that, based upon Welch's assurance that he was "comfortable" with Citiroof's figures, Tech used Citiroof's price.

The Means Construction Guide is a construction industry publication that is used by contractors to estimate prices for construction projects. Witnesses for both parties testified to their general reliance on the Means Guide. Chapolini told the court that, after the Tech bid was submitted to Baltimore County, he consulted the Means Guide to reconcile the large disparity between the Jottan and Citiroof bid numbers. In doing so, he determined that Jottan's final price was "fair and reasonable."

Timothy Maloney, president of Citiroof, was qualified as an expert [3] and told the court that a reasonably prudent contractor, upon receiving two bids with a disparity of such magnitude, should contact the subcontractors to advise of the disparity. The discussion should include the dominant unit measure of square footage and other aspects of the submitted price.

lower than those prevailing in an area. 64 AM.JUR 2D *Public Works and Contracts* § 222 (2004).

**3.** Maloney was qualified, without objection, "as an expert in the field of general contracting and the policies and practices in the industry associated with general contracting and subcontracting, and also with regard to roof contracting."

He also testified that the general contractor ought to obtain additional bids, or if time did not permit such verification or substantiation, the exceptionally low bid should be disregarded. Maloney also provided an opinion that the disparity would indicate to a reasonably prudent general contractor that there was an error in square footage used in the calculation of the low bid.

Chapolini testified that on March 22, the day after submitting Tech's bid to the County, Welch came to his (Chapolini's) office.[4] He recounted the visit:

> Well, he obviously was anxious to know what was going to happen with the bid. I told him that we were the low bidder, but that's really about all we knew at that point. There's so many variables in awarding a contract that we have to wait and see exactly what the County is going to do .... all of the documents have to be reviewed by their Contracts Administration Department, and we typically don't comment on a bid until we get some positive reaction from the owner.

At that time, Chapolini said nothing about awarding the contract to Citiroof. On March 28, 2000, Tech received notification from Baltimore County that its bid was low and that it would be awarded the contract. Tech faxed a standard "Letter of Intent" to Citiroof, dated April 19, 2000, stating:

> This letter of intent will be subject to your successful execution of our contract which will be forwarded to you as soon as possible. This letter of intent supersedes all previous contracts and or proposals and does not include any exclusions, terms or conditions of any previous contracts or proposal otherwise indicated.

On April 25, 2000, at Citiroof's request, Tech forwarded a full set of drawings and specifications to Citiroof. Although Citiroof received the drawings and plans on April 25, 2000, they were not reviewed until just before the final submittals were due on May 8, 2000.

---

4. Welch testified that it was not he who visited Chapolini, but that it might have been another Citiroof representative, Phil Mascaro.

It was that review that caused Welch to realize that the roof plan upon which he calculated Citiroof's bids was "half sized."[5] He immediately informed Maloney, who agreed that, because the wrong scale had been used, only half the square footage had been calculated, and the price was approximately one-half what it should have been. Maloney then did his own analysis for the project, consulting the Means Guide, and determined the proper price for the work ought to have been $57,000. Maloney also determined the price quoted to Tech would not cover Citiroof's direct costs of performing the work, which he calculated to be $42,000, exclusive of the Davis–Bacon wage adjustment.

After discovering the error, Maloney faxed a letter on May 8, 2000, to Tech advising that Citiroof was withdrawing its bid. Citiroof made no mention in this letter of any mistake or miscalculation in its bid. The next day Tech sent a letter to Citiroof asking it to reconsider its withdrawal. During his discussions with Chapolini, Maloney explained that Citiroof would not do the work because of the gross mistake on the bid that was not discovered until after Citiroof had received a full set of plans and specifications. Maloney testified that, in his experience, Baltimore County would allow a general contractor to withdraw its bid if it was determined that it was based upon an erroneous subcontractor's price. After Citiroof declined to perform, Tech sent a letter of intent to Jottan on July 14, 2000, stating that it would contract with Jottan for the roofing at a price of $59,196,[6] and did so on July 18, 2000.

## The Litigation

Tech filed a civil action in the District Court of Maryland for Baltimore City, seeking damages based on the difference

---

**5.** Appellee notes that these "half sized" plans were never offered to the court as evidence.

**6.** Chapolini testified that the difference between Jottan's original bid and the price of $59,196, was "Jottan's generous reaction to Tech's difficulty caused by Citiroof withdrawing its bid."

between the price quoted by Citiroof (upon which it based its bid to the owner) and the cost of the roofing work performed by Jottan. Citiroof demanded a jury trial, resulting in transfer to the circuit court, after which the parties jointly waived trial by jury.

The case was tried before the court on November 5, 2003. The court rendered a judgment in favor of Tech, finding that the evidence was sufficient to satisfy the elements of detrimental reliance. The court made the following findings:

> In *Pavel*,[7] and I don't think that there is clearly established here a binding contractual obligation between the parties. I think the analysis has to fall on the issue of whether there was reasonable reliance by the general contractor of [the] bid that was submitted by the subcontractor, and whether they combined then under the four criteria that are [set] forth in the restatement, and adopted by the Court of Appeals in the *Pavel* decision.
>
> * * *
>
> [With regard to the third element in *Pavel*, reasonable reliance] It says there are many different ways to establish it I suppose, and they made several observation[s]. And last was, that [if] a sub bid is so low that a reasonably prudent general contractor would not rely upon it; the trier of fact may infer that the general contractor did not, in fact, rely upon the erroneous bid. And I have no problem with that observation. Under the facts of this case however, I'm not convinced that it fits. Because there was not a wide spectrum of subcontract bids, there were two. One was at almost $60,000.00 and one was at $32,200.00. And Mr. Chapellini's [sic] testimony was he knew there was something wrong, but that does not prove that he knew a mistake had been made by Tech. And unlike in *Pavel*, we have evidence here the subcontractor was told that there was something wrong. And if you look at Mr. Welch's

7. *Pavel Enterprises, Inc. v. A.S. Johnson Company, Inc.*, 342 Md. 143, 674 A.2d 521 (1996).

notes, he says in recording what happened in this conversation; discussed certain items to verify specs only because were significantly lower. Well, that's a pretty strong clue that there's something amiss. And then, of course, the conversation turns to the scale wages and he fixes on that, and assumes that's the problem, and must have been satisfied ... once he changed that, that that [sic] was putting him more in line.

I don't know that there's any obligation, nobody cited me any authority that there's an obligation on the part of the general to indicate exactly what he might believe is the problem. Even if he had a sense that it might have been the square footage, I don't know that he's under any obligation to say that. There was a lot of talk about various obligations, and I think the most honest answer came from Mr. Maloney ... when asked ... whether he knew a lot of subs that would drop their price once the general was in a squeeze. And [Maloney] said nobody he knows in his industry is likely to do that. I think that's pretty much the way the industry works. To suggest that they had [an] obligation to withdraw their bid and lose the job because there was a mistake on the part of the sub, I don't know that that's the industry standard by anybody's means.

The actual knowledge of what Means [Construction Guide] would have shown the appropriate bid number, the range for it to be in, the testimony and evidence as it came to Mr. Chapellini [sic] well after he knew they were withdrawing, not before he knew they were withdrawing. And at that point, when he checked it and saw that they were off, and that Jotten was closer to the actual number, I don't think it's unreasonable for him to then try and negotiate the best number he can with the only bidder he's got once he knows that they're in the appropriate range. It's unfortunate for the original sub that that error was made, but throughout this—and you very skillfully tried to project this as their error, it's initially [Citiroof's] error. And in order to pass it off to [Tech], you have to establish that they were unreasonable in relying on it. And I think that under all of the facts

of the case, that the Court cannot find that Tech was unreasonable in [its] reliance.

The court awarded Tech $20,276 in damages, the difference between the amount of Citiroof's bid and the amount of Tech's cost to have Jottan perform the roofing work. The trial court denied Citiroof's motion to alter or amend judgment pursuant to Maryland Rule 2–534 on December 2, 2003. Citiroof noted this timely appeal.

## Discussion

*Was the trial court clearly erroneous in finding that Tech had proven the elements of detrimental reliance?*

■ Both parties rely on *Pavel Enterprises, Inc. v. A.S. Johnson Company, Inc.*, 342 Md. 143, 674 A.2d 521 (1996). Not surprisingly, each interprets *Pavel* as supporting its own position.

In *Pavel,* The National Institutes of Health ("NIH") solicited bids for the renovation of a building on the NIH campus. *Id.* at 146, 674 A.2d 521. The major component of the work involved heating, ventilation, and air conditioning ("HVAC"). Pavel Enterprises, Inc. ("Pavel"), a general contractor, solicited bids from potential subcontractors in order to submit a bid for the project. *Id.* at 146–47, 674 A.2d 521. The A.S. Johnson Company, a subcontractor, submitted a written scope-of-work proposal to Pavel on July 27. On August 5, the day NIH opened the general contractors' bids, Johnson verbally submitted a quote for $898,000 for the HVAC component. *Id.* Pavel submitted a bid of $1,585,000 for the entire project, using Johnson's prices in computing its bid. Although Pavel's bid was the second lowest, it was awarded the contract after NIH disqualified the low bidder.

A Pavel representative called at the offices of A.S. Johnson on August 26, to discuss Johnson's proposed role in the project. *Id.* Pavel asked if Johnson would object to Pavel subcontracting directly with a third subcontractor, Powers, for electric controls. Johnson agreed. Following that meeting, Pavel sent a memorandum to all of the mechanical subcontrac-

tors from whom it had received prices, asking them to submit an amended price, deleting the electrical controls work to be subcontracted to Powers. *Id.* at 148, 674 A.2d 521.

On August 30, Pavel mailed and faxed a letter to Johnson formally accepting Johnson's bid. *Id.* at 149, 674 A.2d 521. Upon receipt of the fax, Johnson contacted Pavel to report that Johnson's bid contained an error and, as a result, the price was too low. *Id.* at 150, 674 A.2d 521. Johnson had known of the error earlier, but did not then contact Pavel to correct it, believing that the subsequently disqualified bidder would, in fact, be awarded the contract. *Id.* Johnson then sought to withdraw its bid. Pavel declined, and Johnson refused to perform. Pavel found a substitute subcontractor at a cost of $930,000. Pavel then brought suit to recover the $32,000 difference between Johnson's bid and the cost of the substitute subcontractor. *Id.* at 151, 674 A.2d 521.

The theory of detrimental reliance [8] applies in the construction bidding setting. *Pavel,* at 164, 674 A.2d 521. The Court of Appeals in *Pavel* instructed that Maryland courts are to apply the test of the Restatement (Second) of Contracts § 90(1):

**1. a clear and definite promise;**

**2. where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee;**

**3. which does induce actual and reasonable action or forbearance by the promisee; and**

**4. causes a detriment which can only be avoided by the enforcement of the promise.**

*Id.* at 166, 674 A.2d 521 (Emphasis in original). The Court further elaborated on the elements:

---

**8.** The Court noted "We prefer to use the phrase detrimental reliance, rather than the traditional nomenclature of 'promissory estoppel', because we believe it more clearly expresses the concept intended." *Pavel,* 342 Md., n. 1, at 146, 674 A.2d 521.

In a construction bidding case, where the general contractor seeks to bind the subcontractor to the sub-bid offered, the general must first prove that the subcontractor's sub-bid constituted an offer to perform a job at a given price. We do not express a judgment about how precise a bid must be to constitute an offer, or to what degree a general contractor may request to change the offered scope before an acceptance becomes a counter-offer. That fact-specific judgment is best reached on a case-by-case basis.

\* \* \*

Second, the general must prove that the subcontractor reasonably expected that the general contractor would rely upon the offer. The subcontractor's expectation that the general contractor will rely upon the sub-bid may dissipate through time.[9]

\* \* \*

As to the third element, a general contractor must prove that he actually and reasonably relied on the subcontractor's sub-bid. We decline to provide a checklist of potential methods of proving this reliance, but we will make several observations. First, a showing by the subcontractor, that the general contractor engaged in "bid shopping," or actively encouraged "bid chopping," or "bid peddling" is strong evidence that the general did not rely on the sub-bid. Second, prompt notice by the general contractor to the subcontractor that the general intends to use the sub on the

---

9. With regard to the dissipation of the subcontractor's expectation, the Court of Appeals opined: "We expect that evidence of 'course of dealing' and 'usage of the trade', see Restatement (Second) of Contracts §§ 219–223 (1979), will provide strong indicies of the reasonableness of a subcontractor's expectations." *Pavel, supra,* 342 Md. at 167 n. 30, 674 A.2d 521. The Restatement (Second) of Contracts § 219 defines usage as "habitual or customary practice." Section 223(1) defines "course of dealing" as "a sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct."

job, is weighty evidence that the general did rely on the bid. Third, if a sub-bid is so low that a reasonably prudent general contractor would not rely upon it, the trier of fact may infer that the general contractor did not in fact rely upon the erroneous bid.

\* \* \*

Finally, as to the fourth prima facie element, the trial court, and not a jury, must determine that binding the subcontractor is necessary to prevent injustice. This element is to be enforced as required by common law equity courts—the general contractor must have "clean hands." This requirement includes, as did the previous element, that the general did not engage in bid shopping, chopping or peddling, but also requires the further determination that justice compels the result. The fourth factor was not specifically mentioned by the trial judge, but we may infer that he did not find this case to merit an equitable remedy.

*Id.* at 167–68, 674 A.2d 521 (footnotes omitted).

Tech argues, and Citiroof does not deny, that Citiroof's bid was a clear and definite promise. We agree; hence, the first element of detrimental reliance is satisfied.

As to the second and third elements, Citiroof argues that because of the lapse of time (29 days) between the submission of the revised bid by Citiroof and Tech's first notice that it was accepting its bid, there was no expectation, or very little at best, that Tech would be relying on Citiroof's bid. We are not persuaded. There is no evidence that 29 days is an unreasonable period of time in the usual bidding process. Moreover, prior to submitting its bid to the owner, Tech advised Citiroof that if its price was the lowest, it would be used in Tech's bid.

Further, Maloney (Citiroof's president) testified that general contractors rely on subcontractors' bids "all the time." Tech's bid summary sheet indicates use of Citiroof's price in calculating its bid to the County. Tech answers the issue of delay in notifying Citiroof by referring to Chapolini's testimo-

ny that the awarding of a contract involves "so many variables" that some time is necessary. There was no evidence before the trial court that the intervening time was unreasonably expanded, or used by Tech for the purpose bid shopping, chopping, or peddling. Therefore, we find the 29 day delay to be unremarkable.

The instant case is distinguishable from *Pavel*. After being notified that it was to be awarded the NIH contract, Pavel "shopped" the prices by requesting all potential subcontractors to resubmit their prices. Tech engaged in no such effort. The *Pavel* Court found that the request for re-submission of prices caused Pavel to no longer rely upon Johnson's original price.

Citiroof argues that the price discrepancy would have alerted a reasonably prudent contractor not to rely, particularly since Tech sensed the price was, in some manner, incorrect. Their argument is analogous to the doctrine of last clear chance—although Citiroof erred, the error was actually attributable to Tech because it did not decline to accept Citiroof's low price.

Tech, in turn, urges us to affirm the trial court's assessment that Tech's reliance was "reasonable under the facts of this case." It is uncontroverted that Chapolini told Welch about the other substantially higher bid, and asked Welch to review his own bid. We agree with Tech that it is not the responsibility of the general contractor to guarantee the accuracy of the subcontractor's bid. The trial court was not clearly erroneous in determining that Tech reasonably relied on Citiroof's bid.

With regard to the fourth element, detriment, Citiroof argues that justice does not compel binding Citiroof to an erroneous bid that Tech knew, or should have known, was erroneous. Tech was awarded the contract and was without a roofing subcontractor. Because the only other price submitted was by Jottan, Tech had no other option. Citiroof's withdrawal created a detriment, causing damage to Tech in the amount of the difference between the prices submitted by Jottan and Citiroof, respectively.

We find no error in the trial court's determination that Tech relied on Citiroof's bid to its detriment, and that Tech's detrimental reliance binds Citiroof to its price.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**